OPINION OP THE COURT. PARKER, J. — This is a proceeding in mandamus to compel the investment of the Permanent School Funds of the State in the State Highway Bonds. It appears that respondent, as State Treasurer, received from the Territorial Treasurer, at the inception of the State government, the sum of $110,453.52, the result of the sales of public lands of the United States in the Territory, under the terms of the Act of Congress of June 21, 1898, 30 Stat. L. 484, 6 Fed. Stat. Ann. 482. These funds, at the time respondent took office, were deposited in banks, in pursuance to the provisions of sec. 36 of chapter 104, laws of 1907, where they- still remaian. Since Statehood, respondent has received funds of the same class and from the same source in the amount of $10,-587.31 and $3,825.86 as proceeds of the sale of school lands in the State. All of these funds constitute the Permanent School Funds of the State. Chapter 104, laws of 1907, was repealed by section 79 of- chapter 82 of the laws of 1907, leaving no statutory authority for the deposit of these funds in banks, until the session of the State legislature of 1913. By section 10 of the enabling act, 36 Stat. L. 557, 1 Sup. 1912, Fed Stat. Ann. 357, it was provided as follows: “Sec. 10. That it is hereby declared that all lands hereby granted, including those which, havaing been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for' the several objects specified in the respective granting and. confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the-same* trusts as the lands producing the same.” * * * * * “A separate fund shall be established for each of the-several objects for which the said grants are hereby made- or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be-deposited by the State Treasurer in the fund corresponding to the grant under which the particular land producing such moneys were (sic) by this act conveyed or confirmed. The State Treasurer shall keep all such mouevs invested in safe interest-bearing securities, which securities shall be approved by the Governor and Secretary of State of said proposed State, and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto-as defined by this act and the laws of the State not in-conflict herewith.” By section 7 of article XII of the Constitution of the-State, it was provided as follows:— ‘'Sec. 7. The principal of the permanent school fund shall be invested in the bonds of the State or Territory of New Mexico, or of any county, city, town, board of education or school district therein. The legislature may by three-fourths vote of the members elected to each house-provide that said fuhds may be invested in other interest-bearing securities. All bonds or other securities in which any portion of the school fund shall be invested must be first approved by the governor, attorney general and secretary of state. All losses from such funds, however occurring, shall be reimbursed by the state.” In pursuance of the provisions of this section of the Constitution, the State legislature of 1913, (by a required three-fourths vote of each house, it is assumed by counsel on both sides), passed Joint Kesolution No. 14, which is as follows: “Section 1. That the principal of the permanent school fund may be invested in an interest-paying deposit in any bank or banks in this state, in the manner hereinafter provided. “Sec. 2. It is hereby made the duty of the Governor, State Treasurer, Attorney General and Secretary of State, to ascertain which bank or banks in the State will pay the highest rate of interest for the deposit of the said permanent school fund and deposit the same therein upon said bank or banks giving a bond as hereinafter required. “Sec. 3. Before the making of the deposit of the said permanent school fund in .any bank or banks applying therefor, the said bank or banks shall make, execute and deliver a bond to the State of New Mexico in a penalty which shall not be less than one and one-fourth the amount of the deposit applied for and which it is to receive, conditioned that such bank will promptly pay out to, the parties entitled thereto, all such public monies in its hands upon lawful demand made therefor and will whenever thereunto required by law, pay over to the State Treasurer such monies. The surety on such bond shall be a surety company authorized to do business under the laws of the State and such bond shall be approved as to form by the Attorney General, and as to the sufficiency by the Governor, State Treasurer and Secretary of State.” In pursuance of said joint resolution No. 14, the Governor, Secretary of State, Attorney General and State Treasurer, met on June 16, 1913, and decided to request bids from banks for the deposit of the entire Permanent School Fund, amounting to $121,040.78, and accordingly the State Treasurer requested bids for the deposit of the same from the banks of the State, to be received up to July 1, 1913. Many of the banks responded, and offered to pay interest at rates ranging from three and one-half per cent to seven and five-eighths per cent per annum. At a meeting of said officers, held on July 1, 1913, for the purpose of opening and passing on said bids, the following resolution was adopted, the respondent, as said Treasurer, voting in the negative, viz: “KESOLVED, That all of the bids received from the various banks for deposits of the Permanent School Fund be rejected for the purpose of investing said funds in the State Highway Bonds, the difference in the rate of interest received, which would be about four cents per annum per capita of school children as shown by the last enrollment, being so small as to be more than offset by the benefits to be derived from the construction of highways to the schools themselves as well as to all other interests.” On July 7, 1913, the respondent addressed a letter to the Governor, Secretary of State and Attorney General, which is as follows :■— “Dear Sir: “I am firmly of the conviction that the'investment of the Permanent School Fund of the State in the securities offered under House Joint Kesolution No. 14, by the banks offering'the highest rate of interest in the bids opened on Tuesday last, the first of July, is the best and safest investment that could be made of these funds. “In the resolution rejecting these bids, which is as follows, (the preceding resolution) you do not base your disapproval of these securities upon the ground that they are not safe nor that they would not bring the largest returns to the Permanent School Fund, but solely upon the ground that it was for the purpose of investing these funds in the Highway Bonds. “I deem it to be my duty, under the law, to most respectfully decline to invest these funds in the Highway Bonds for the reason that the Highway Bonds jdeld only 4%, while the bank securities offered will average more than 6% and for the further reason that the value of the Highway Bonds, measured by the best bids obtained therefor, is only 77, while we would be required to pay par or-100. “I respectfully request, therefore, that you indicate tome whether or not you deem these bank securities offered to be unsafe. In the event that you approve the same as-to their safety, I will make the investment in the proper bank securities. “Yours very truly,” On July 10, 1913, the Governor, Secretary of State and' Attorney General addressed to the respondent a letter, in-, reply to his letter of July 7, as follows:— “We decline to pass upon the question as to whether the-bank securities are unsafe or not, as it is no part of our duty to do so, nor have you any right to demand of us ■that we should pass on that question, especially after we have united in rejecting the bids of the banks for the-avowed purpose of investing the funds in the State Highway Bonds. “We cannot find any provision of law giving 3ou any authority to make any investment of this fund except as. directed by us, nor are you in any way charged with any responsibility as to such investment. No investment of' the fund can be made in any securities unless they are-first approved by the Governor, Secretary of State and Attorney General, and if there should be any resulting losses-from such investment the State must reimburse them, but there is nothing to make you officially or personally liable for what is done. “Therefore, we now say to you that, under existing circumstances, we approve of the investment of this fund in the State Highway Bonds, and that we will not approve-of its investment in any other securities at this time.” The State Treasurer, still persisting in his refusal to-withdraw these funds from the bank and invest them in the State Highway Bonds, this proceeding was instituted by the Attorney General, ex-officio, in behalf of the State.. It is to be. observed that the enabling act imposes no restrictions, in terms, as to the class of interest-bearing securities in which the funds may be invested, the only restriction in this regard being that they be “safe.” The supervising control over the investment, conferred upon the Governor, and Secretary of State by that act, however, would seem to vest in them power to exclude any given class of securities which might, in their judgment, be deemed unsafe. On the other hand, the Constitution expressly limits, in terms, the class of securities in which these funds may be invested, until the legislature shall otherwise provide. The supervising body is enlarged by the addition of the Attorney General. Otherwise the enabling act and the Constitution are the same in substance and effect, except that, by the Constitution, the Treasurer is not, in terms, charged with the duty of investing the funds. This latter divergence we deem of no- importance, as it would seem clear in the light of both provisions, that it is still the duty of the State Treasurer to invest the funds in interest-bearing securities, subject to the restrictions and the supervision and control provided for in the Constitution. As before stated, the legislature of 1913, by said joint resolution No. 14, attempted to pursue the power conferred by the constitutional provision and provided that these funds should be ‘‘invested in an interest-bearing deposit in any bank or banks in this State,” in the manner in the resolution provided. The deposit, when made, is not for any definite period of time, but is “conditioned that such bank will promptly pay out to the-parties entitled thereto, all such public monej's in its hands, upon lawful demand made therefor, and will whenever thereunto required by law pay over to the State Treasurer such moneys.” It thus appears that, by the terms of the resolution, these funds are always subject to the immediate call of the State Treasurer and the bank makes no-contract to relain them and may at any time, we assume, surrender them to him. The funds are subject to the check of the State Treasurer at any time in favor of any person entitled to receive the same by reason of some investment thereof, or the State Treasurer may at any time recall the funds from any given bank or banks. The words "required by law,” in this connection, must evidently mean that whenever, by reason of demand of the State Treasurer, the legal duty to return the funds arises, the bank or banks are "required by law” to return the same. Otherwise, if it be required to have a new act of legislation before the banks can be held to be "required by law ’ to return 1 he moneys, then, when the State Treasurer has once deposited them m a bank, they must remain there until the legislature recalls them, regardless of the solvency or insolvency of the bank and the consequent danger of loss of the funds and vexatious litigation with the sureties on the bank’s bonds. Such could not have been the legislative intent as expressed in the joint resolution. The State Treasurer must he held to have at all time-: the right to immediately call for the funds, either for the purpose of investing them in interest-bearing securities, or of recalling them from any bank in which, for any reason satisfactory to him, or for no reason, he no longer desires 1 lie deposit to r,emain. We have, then, a case where the enabling act and the Constitution require the investment of the Permanent School Fund of the State in interest-bearing securities, and where the legislature has authorized and required the deposit of these funds in banks subject to the call of the Stale Treasurer, and the question is, whether this is an investment of the funds within the meaning of the provisions of the enabling act and the Constitution. Various cases are reported, in which the question as to ■what amounts to an investment of public and private funds has arisen. In State v. McFetridge, 54 N. W. 1, 84 Wis. 473, 20 L. R. A. 223, the State Treasurer of Wisconsin was sued on his official bond for interest received hy him on deposits in banks of the public funds, and his liability was made to turn upon whether his act in making the deposit was lawful or unlawful, which, in turn, depended upon whether or- not the deposit was an investment of the funds. If it was an investment of the funds it was unlawful, because the concurrence of the Governor and Commissioners of public Lands was necessary, and liad not been obtained. The Court said : — “If those deposits were ‘investments’ within the meaning of the above statutes, they were unlawfully inade. Were they investments? The distinction between a general deposit of money in a bank, payable at any time on demand, and an investment of such, money, is plain and substantial. By such a deposit the depositor does not lose control of the money, but may reclaim it at any time. True, he loses control of the specific coin or currency deposited, but not of an equal amount of coin or currency having the same qualities and value, which, as we have seen, is all that is required of him. But if the funds in the treasury are invested in United States or State bonds, or in loans on time to counties, cities, etc., the treasurer loses control thereof, and the same cannot be replaced in the treasury'until such bonds are paid or sold, or such loans become due, and are collected by the due course of law. The retention by the treasurer of substantial control over the funds in the one ease, and his loss of suck control in the other, mark the leading distinction between a mere deposit of the funds and an ‘investment’ thereof, as those terms are used in statutes.” In State v. Barclay, 58 N. W. 172, 39 Neb. 353, 23 L. R. A. 67, a different definition was given to the word. The Constitution of that State required the investment of the Permanent School Fund in the United States, or State, securities, or registered county bonds, and the legislature provided that all public funds should be deposited in banks which should pay interest and give security for the safety of the funds, and hold the funds subject to cheek by the State Treasurer. Mandamus was brought to compel the deposit of some of these funds in a bank, and it was held that in-so-far as the act authorized or required the deposit of the educational funds, it provided for an ‘‘investment” of the same in a manner not authorized by the Constitution, and was, therefore, invalid. The Court defined the word “investment” as including bank deposits, notwithstanding they are subject to immediate withdrawal. As applied to private funds, the word “investment” has. been frequently defined. Thus in Law’s Estate, 144 Pa. St. 499, 14 L. R. A. 103, a guardian had deposited funds, of his ward in a bank awaiting investment. The bank was to pay three per cent interest, and he was to give two-weeks’ notice before withdrawing the funds. The bank failed and the guardian was sought to be charged with the loss, on the theory that he had invested the moneys and was, consequently, liable. The Court said: “Was this transaction with the Bank of America a deposit of the money, or was it a loan or investment of it?' A deposit is where a sum of money is left with a banker for safekeeping subject to order, and payable, not in the specific money deposited, but in an equal sum. It may or may not bear interest, according to the agreement. While the relation between the depositor and his banker is that of debtor and creditor simply, the transaction cannot in any proper sense be regarded as a loan, unless the money is left, not for safe-keeping, but for a fixed period at interest, in which case the transaction assumes all the characteristics of a loan.” In Jennings v. Davis, 31 Conn. 134, 143, it is said:— . “It is not stated whether the money was deposited in the bank for safe-keeping merely, or in the character of a loan to the bank for which a stipulated rate of interest was to be paid during its continuance there; nor is is material to inquire, because, in either case, the deposit (being a general, as contradistinguished from a special one) created a debt in favor of the depositor and against the bank, and then the money became “invested” in that debt, and being thus invested in the name of Mrs. Morehouse, was protected by the statute against her husband’s claims upon it.” See also 4 Words, and Phrases, title Investment, where many cases are collected. . The Wisconsin and Pennsylvania cases draw a distinction between deposits for a definite period of time and those which are subject to call by check or'order, holding that the former would constitute an investment, and that the latter would not. The Nebraska-Connecticut cases recognize no such distinction, and rely upon the well-known principle that upon the deposit of funds in a bank, the title to the money passes to the bank, and the relation •of debtor and creditor arises between the bank and the depositor. This is so whether the money is subject to ■call, or whether the debt of the bank to the depositor matures at some specified future time. The law applies to a transaction, in either form mentioned above, an obligation to pay its debt to the depositor according to the terms ■of the deposit. We assume that had the legislature, in its joint resolution No. 14, provided for the deposit of these funds for stated periods of time, no one would question that their ■deposit in that form would be an investment for the same. If this is so, then the legislature might have provided for annual, or semi-annual, or quarterly, periods of time, or ■even a shorter period, so that the transaction of depositing these funds would be, in substance and effect, as a practical matter, the same as it now is provided for in ■said joint resolution. -It may be that the definition of the word “investment” bj the Wisconsin and Pennsjdvania ■courts is more scientifically correct, but we can see no good reason to unduly hamper the legislative branch of the ■government by adopting a construction of the enabling ■act and the-.Constitution which would subserve no useful purpose. The legislature has, to all intents and purposes, accomplished by the joint resolution all that it could accomplish by a more scientifically drawn act, if, indeed, it has not added to the security and safety of, these funds by providing that they may be withdrawn at any time, from any bank in which they may have been deposited. 1 We, therefore, hold that the deposit of the Permanent School Funds of the State in banks, in pursuance of provisions of said joint resolution, is an investment of the same, unless prohibited by the considerations mentioned in the next paragraph. The Attorney General argues that the words “other interest-bearing securities” are to be construed ejusdem generis with the class of securities specifically mentioned in the section of the Constitution, and that, therefore, bank deposits are prohibited as a form of investment of these funds. The argument has great force. Taking into consideration the character of the fund provided h]»- the Federal government for the education of the youth of the State, its permanency and ever-increasing volume, the evident care with which the donor has safeguarded the same by the terms of its grant, and the character of the investments enumerated in the Constitution, there is presented to the mind, at once, the question whether it was not the intent of both congress and the constitutional convention, by the use of the word ‘'securities,” to limit the investment of these funds to some form of obligation for the payment of which the taxing power is available. It may be said, however, that the taxing power of the State is available to reimburse the fund in case of loss for any reason. But loss of the fund is exa'etly what is not to be desired and every consideration, consistent with the circumstances and language used, should be indulged to avoid the possibility of the same. On the other hand,- the rule of construction mentioned may not be employed unless the same is consonant with the intent of congress and the constitutional convention as expressed in the enabling act and the Constitution. In this connection, it may be said that while the Permanent School Fund, at present, is comparatively small, it is to be borne in mind that this fund is a permanent fund for all time, and must, necessarily, constantly and rapidly increase. The proceeds from the sales of the lands so bountifully granted by the United States for educational purposes, will swell this fund so that within a comparatively short time it may reach such proportions as that it may become difficult to find in the class of securities enumerated in the Constitution a place for the profitable investment of the same. The legislature, it may be said, should be left free, if possible, to meet such conditions when they arise, and for that reason, the restricted interpretation, before mentioned, ought not to be applied. 2 We expressly decline to decide this proposition at this time, and what has been said is for the purpose, merely, of calling attention to the question, so that its importanee may be more fully appreciated. We decline to decide the question because its decision is not necessary to a decision of this case, and because the same was not fully treated by counsel in argument or in the briefs. When, if it shall be, in some case in future, the question is clearly presented to the Court, and fully argued, we shall then feel that it is proper to dispose of it. The legislature, in said joint resolution No. 14, has attempted to control the discretion of the Governor, Secretary of State and Attorney General in the exercise of their supervisory control over the investment of these funds. The act is mandatory in terms, and requires them, absolutely, to deposit the funds in banks. In this the legislature has evidently exceeded its constitutional power. The Constitution has conferred upon the Governor, Secretary of State and Attorney General the power to approve or disapprove any proposed investment of these funds. This discretion is in no way limited, but is absolute. It is not confined to the question as to whether the investment is safe or not. If for any reason, lack of safety, length or shortness of time for which the loan can be obtained, rate of interest obtainable, or any other consideration of public policy, any given investment of these funds is deemed inadvisable, the Governor, Secretary of State and Attorney General clearly have the power to withhold their approval, and we know of no authority, neither legislative nor judicial, to control this discretion. The grant of legislative power in the section of the Constitution is not a grant of power to direct the investment in any particular form of security. The selection of the investment is not a legislative function under the provisions of the Constitution. 1 Our view being that the order in question could not be countermanded, as an abstract proposition of law, for which reason the objection of appellant.fails and our opinion upon the subject of appellee’s contention with respect to' the findings becomes purely an academic question which we decline to pass upon. . We, therefore, hold that said joint resolution, insofar 3 as it requires the deposit of these funds in banks, is beyond the legislative power and void. This conclusion leaves the respondent without any authority to make these deposits, the approval thereof having been expressly refused by the Governor, Secretary of State and Attorney General. The real, practical, controversy between the State Treasurer on the one hand, and the Governor, Secretary of State and Attorney General on .the other, is as to who has the right to select the securities for the investment of these funds. The State Treasurer, believing in the validity of the joint resolution, and being desirous of obtaining the largest possible return in the way of income on the money, insists upon the deposit of the funds in banks. In his right to do so, over the objection of the Governor, Secretary of State and Attorney General, as we have seen, he is mistaken. On the other hand, the Governor, Secretary of State and Attorney General, notwithstanding the incomQ will be slightly less, insist upon the investment in the State Highway Bonds. It is argued by -the Attorney General that the greater permanency of the investment in these bonds, the direct benefit of good public' highways to the schools themselves, and the subserving of the general welfare of the people of the State, more than counterbalance the temporary slight loss in income. It is argued for the State Treasurer that, as he is charged by the enabling act with the duty of keeping the funds constantly invested and is required to give bond for the faithful performance of his duty, he must secure the highest possible income from these bonds consistent with safety. On the other hand, the Attorney General argues that there is no liability of the State Treasurer on his bond so long as he, in good faith, invests the funds within the constitutional restrictions, and with the approval of the Governor, Secretary of State and Attorney General. In this position he is correct. It is to be observed, in this connection, that no absolute duty is imposed upon the State Treasurer'to invest these funds. The duty of doing so is conditioned upon his obtaining the approval of the Governor and Secretary of State, by the enabling act, and of the same officers, together with the Attorney General, by the Constitution. If he endeavors to obtain this approval and exhausts all available source?, and fails to obtain it, his duty and, consequently, his liability, necessarily ceases. "We have then, simply, a question as to who, the State Treasurer on the one hand, or the- Governor, Secretary of State and Attorney General on the other, has the right to determine the particular form of investment in which these funds may be placed. It is argued that this supervisory power of the Governor, Secretary of State and Attorney General is in the mature of a veto power. This may be admitted. 4 The usual and orderly course of procedure, we assume, would be for the State Treasurer to submit to the Governor, Secretary of State and Attorney General, a list of available and safe investments for approval. He is, no doubt, primarily chargeable with the duty of ascertaining these available channels of investment, and is entitled to present the same for approval, and to urge upon the Governor, Secretary of State and Attorney General the advisability and expediency of making such investments. It 'nevertheless remains true that the Governor, Secretary of State and Attorney General have the power to eliminate any given form of investment and by that process of elimination they may reduce the State Treasurer to one single form of investment, that being the one form left to him which will receive the necessary approval. Thereupon, there arises, except under circumstances to be hereafter mentioned, a ministerial duty on the part of the State Treasurer to invest the funds. This duty does not arise by reason of any order or direction of the Governor, Secretary of State and Attorney General. The State Treasurer occupies as important a position, and is charged with even greater responsibility than they are, in regard to the investment of these funds. His ministerial duty arises out of the law provided by Congress in the enabling act, for the administration of this fund, and which act requires the fund to be kept invested in safe, interest-bearing securities. The duty is ever-present, and is never discharged until the whole field has been explored, and exhausted without avail. It is the law of the administration of the trust, not any. order or direction of the Governor, Secretary of State and Attorney General, which furnishes the basis for any remedy against, the State Treasurer by mandamus. If a given investment, under such circumstances, is safe,, there is no discretion left in the State Treasurer under the-terms of the rule for the administration of his trust prescribed by the enabling act. He must invest the funds in-safe, interest-bearing securities, and he may be compelled-to do so by mandamus. At this jioint a consideration presents itself which is not directly nivolved in this case. It is this. By the terms of the enabling act, which, together with the Constitution, is the law for the administration of this trust, the State-Treasurer is charged with the duty of safely investing these-funds, and must give bond for the faithful performance of this duty. It, therefore, becomes his duty to inquire into- and pass upon the safety of any given investment before-it is made, and he may have a discretion in that regard,, not subject to control by mandamus. This discretion, if possessed by the State Treasurer, is of. no importance-where the proposed security is one of those specifically enumerated in the Constitution, as in this case. But if the proposed investment were bank deposits, as now authorized or were in some other form, as might be provided by the-legislature in the future, then this discretion of the State-' Treasurer, if he possesses the same, might become of vast-importance in safe-guarding the fund. Whether important, or unimportant, in any given case, is not the question. If it is possessed by him, he is entitled to exercise it, and it cannot be controlled by mandamus. As before-stated, this question is not directly involved in this case, and is not relied upon in argument, and, for that reason, we expressly refrain from deciding whether the State-Treasurer has this discretion, or, if he has, just what its-nature and extent is, reserving the question for future determination when it arises. If the State Treasurer has the discretion hereinbefore mentioned, he is not, of course, subject absolutely to mandamus to make any particular form of investment of these funds. But when, by the process of elimination, heretofore mentioned, he is left with but one form of available investment, he may be proceeded against and put in motion, and compelled to do all of such acts, including the exercise of such discretion as he may possess, as are required of him by the law of his trust, all to the end that it shall be determined whether the given investment shall be made or not. 5 A * practical difficulty is presented by the record in this case. Chapter 58, laws of 1912, authorizes the issuance of these bonds, section 4 requires the bonds to be sold at not less than par and accrued interest from the next preceding interest date, and requires four weeks’ publication of notice of the time and place of sale. No such notice has been given, and the proposed sale under the former notice was not continued by the State Treasurer. The proceeding, in its present form, is not broad enough to compel the State Treasurer to re-advertise a sale of these bonds, nor to bid at such sale the amount required by the act. As we understand the rule, relief may be granted for less than what is prayed for, but not more, and the acts sought to be enforced must be specifically pointed out in the alternative writ. High Ex. Leg. Rem., sec. 450; 26 Cyc. 466; State v. Cavanao, 30 La. Ann. 237; People v. Dulaney, 96 Ill. 503; State v. Einstein, 46 N. J. L. 479. This has not been done in this case, and the relief sought, for this reason alone, must be denied. The peremptory writ is denied.