181 P.2d 336

**MURPHY et al. v. STATE.**

No. 4662.

Supreme Court of Arizona.

May 26, 1947.

Rehearing Denied June 16, 1947.

Stockton & Karam, of Phoenix, for appellants Harold Murphy and Ruth Murphy.

Tom Fulbright, of Florence, and Kramer, Morrison, Roche & Perry, of Phoenix, for appellant Ohio National Life Ins. Co.

John L. Sullivan, Atty. Gen., and Harry O. Juliani, John W. Rood, and Burr Sutter, Asst. Attys. Gen., for appellee.

LaPRADE, Judge.

This appeal is from a judgment cancelling certain deeds from the state of Arizona to Ed E. Murphy and wife, and from Murphy and wife to the state. The judg-

ment also cancelled and annulled a mortgage from the successors in interest of Murphy to the Ohio National Life Insurance Company on the lands received from the state in the exchange.

This decision is perhaps unduly lengthy but, due to the rights asserted and the possible ultimate disposition of more than 10,000 acres of land acquired by the state on foreclosures resulting from the nonpayment of loans made from the permanent school and institutional funds, we have not been able to more summarily dispose of the case. The gravity of the issues involved is brought into bold relief by the realization that the state of Arizona now holds in trust for the use and benefit of its common schools and other institutions nearly 9,000,000 acres of land granted to it by the United States at and before its admission into the Union. There has accrued to the state from sales of a small portion of the lands granted approximately $5,000,000, which sum is held in trust for the uses and benefits set up in the Enabling Act (permanent school and institutional funds).

### Statement of Facts.

On October 8, 1940, the state treasurer, with the approval of the governor and secretary of state, traded and exchanged lands with Murphy. The lands exchanged and traded by the treasurer constituted 1440 acres. The *legal* title to these lands was vested in the state of Arizona. These lands were not grant land from the United States government to the state. The entire acreage was patented by the United States government and by mesne conveyances was vested in a number of individuals who years ago borrowed, from various state treasurers, money belonging to the permanent school and institutional funds of the state, and gave mortgages to secure the repayment of the monies borrowed. The mortgagors failed to repay the money borrowed, the state foreclosed, and at sheriff's sale bid in and thus acquired title. All of the lands involved herein are in Pinal county. The lands traded by Murphy to the state comprised two sections aggregating 1280 acres. These two sections were originally patented by the United States government to predecessors in interest of Murphy who had acquired title by mesne conveyances. These lands were never grant lands from the United States government to the state. Mr. Murphy died in February, 1941. His son, Harold Murphy, one of the appellants herein, prior to commencement of this litigation became the owner of this property in part by inheritance as a son of his father, acquiring the remainder by purchase from the surviving wife and other heirs of the deceased. Subsequent to the acquisition of the lands, the Murphys made extensive and costly improvements thereon. In this connection they borrowed from appellant Ohio National Life Insurance Company the sum of $40,000, which they secured by a realty mortgage on the premises and improvements thereon.

The state treasurer testified that the exchange was prompted by a desire on the part of all parties concerned to develop a dependable water supply if possible and thus enhance the value of the land belonging to the state and to Murphy; that the 1440 acres owned by the state interlaced other lands of Murphy; that the two sections traded by Murphy were contiguous, and by the exchange each of the parties secured a compact body of land; and that the state owned considerable acreage in the same vicinity and it was known that without proof of available water the land had no value other than that of desert land. Other testimony was to the effect that the development of water has created a condition in which the two sections of land acquired by the state with its other lands now have a very real and substantial value; that it was and is impractical to spend many thousands of dollars in drilling and equipping a well for an acreage smaller than a section; and that the speculative risk was too great for Murphy to undertake had he not owned considerable acreage in a compact body. By the exchange he had effected a consolidation of some 2500 acres.

The 1440 acres exchanged by the state had been under lease to other parties since the year 1935 or before. To acquire this lease and the improvements thereon, Murphy paid the sum of $30,700 to the then lessee from the state. At the time Murphy acquired the lease, there were 640 acres in cultivation, 352 acres of which were planted to cotton. Sections 5 and 8, Twp. 5 S, R 4 E, G. & S. R. B. & M., Pinal county, Arizona, deeded by Murphy to the state, were unimproved and in native brush. No improvements had been placed thereon at the date of trial.

The water for irrigation was furnished by four wells, one of which was 470 feet in depth. With reference to the improvements at date of acquisition, Harold Murphy testified: "There was four wells equipped, and approximately 352 acres in cotton, and an old store building and many cotton picker houses, and roads and ditches and it was all fenced, and an electric power line, of course, was all around it." Murphy's assignor had expended approximately $40,000 in drilling and equipping the wells.

After the exchange of titles, Murphy secured a lease from the state on Sections 5 and 8, Twp. 5 S, R 4 E, which he had just traded to the state. He now has these two sections under lease.

Murphy had the existing wells "dry iced," which improved the production of all the wells except one. He drilled a new well 707 feet deep on the SE¼ of Sec. 28, Twp. 4 S, R 4 E, acquired from the state, at an expense of some $11,000. At the time of the trade, the south half of Sec. 21, Twp. 4 S, R 4 E, acquired from the state, was covered with desert flora. Murphy grubbed out the mesquite, plowed the land, bordered it, and put it into cultivation, at an expense of approximately $4000.

In the exchange of the land the state treasurer made no attempt to comply with section 28 of the Enabling Act or the provisions of article 10 of the Constitution of Arizona. Generally, the provisions of the Enabling Act and the Constitution, with distinctions to be noted later, require that grant lands acquired by the state upon its admission to the Union be held in trust for certain purposes; that they can be disposed of only after appraisal and sale at public auction, after being advertised for ten weeks, at not less than $3 per acre, and not more than 160 acres to any one person, to the highest and best bidder for cash. In addition to the Enabling Act and constitutional provisions referred to, the state legislature had enacted certain laws purporting to govern the sale and disposition of any lands that had been acquired by the state on foreclosure for nonpayment of loans made from the permanent school fund. This fund had been created through sale of grant lands. Statutory provisions required that lands acquired on foreclosure should be administered "for the benefit of the fund from which the money loaned was derived, in the manner provided by law for administration of lands of similar character." Laws 1939, ch. 86, sec. 4, page 265; sections 10-312 and 10-313, A.C.A.1939.

It is the contention of the state that the transaction in question is void whether it is called a sale or an exchange for the reasons that: first, no exchange of land by the state of Arizona is authorized by law; and, second, if the transaction was a sale, provisions of the Enabling Act, Constitution, and statutes regarding notice, bidding, and amount of land that may be conveyed to one individual were not followed by the state treasurer.

Appellant Murphy's appeal presents two questions for determination: (1) Do the provisions of the Enabling Act (section 28) and the Constitution of Arizona (article 10) relating to the sale of grant lands apply to the administration and sale of land, never grant land, title to which the state acquired by foreclosure of mortgages given to secure the repayment of loans of institutional funds (proceeds of grant lands); (2) Did the legislature have authority to enact section 4, chapter 86, Laws 1939 (section 10-313, A.C.A.1939) providing that: "In the event that title to any farm lands serving as a security for an investment or loan of moneys in the permanent funds vests in the state, such lands shall be administered for the benefit of the fund from which the money loaned was derived, in the manner provided by law for administration of lands of similar character."

### Enabling Act, Constitution, and Statutes to be Considered.

No comprehensive approach can be made to the issues without a minute appraisal of the laws involved. We, therefore, deem it necessary in the course of this opinion to set forth these provisions en toto.

The Congress of the United States enacted and there was approved on June 20,

1910, an Enabling Act for the admission into the Union of New Mexico and Arizona. Sections 1 to 18 of the Enabling Act refer exclusively to New Mexico. The Enabling Act as it refers to Arizona commences at Section 19 and continues through section 35, and is found on pages 37 to 51 of Arizona Code Annotated, 1939, in volume 1. The provisions of the New Mexico Enabling Act, with reference to granted land, its sale, and the investment of permanent school funds derived therefrom, are identical with the provisions of the Enabling Act affecting Arizona.

This Enabling Act was accepted by the people of Arizona (par. 12, art. 20, Const.), and it, therefore, became and is the fundamental and paramount law. It cannot be altered, changed, amended, or disregarded without an act of Congress. Par. 13, art. 20, Const. The Arizona Constitution cannot be inconsistent with the Enabling Act.

It is thus necessary that we examine the provisions of the Enabling Act to orient ourselves in determining the power of the state treasurer, acting with the approval of the governor and the secretary of state, in exchanging lands acquired at sheriff's sale in actions foreclosing mortgages given to secure repayment of institutional funds loaned by the state treasurer.

The pertinent provisions of the Enabling Act are found in sections 24, 25, 26, 27, and 28 thereof. Before considering these provisions, we desire to mention the fact that the Enabling Act has been amended twice by Congressional enactment: first, by the Act of August 24, 1935, ch. 648, 49 Stat. 798; and, later, by the Act of June 5, 1936, ch. 517, 49 Stat. 1477.

By section 24 of the Enabling Act there is granted by the United States government to the state of Arizona, for the support of the common schools, sections 2 and 32 in every township. Prior to the Enabling Act there had been reserved to the territory of Arizona for the same purpose sections 16 and 36. These four sections under the Enabling Act thus reached the state for the support of common schools. There are found in section 24 certain exceptions and provisions for substitution of certain lands so as to assure the state's securing "for the support of common schools" four full sections in each township. We are not here concerned with the exceptions or provisions for exchange.

By section 25 of the Enabling Act the United States government grants to the state of Arizona large acreages of land for twelve separate purposes. These purposes are listed with the number of acres granted for each. These grants are in lieu of other benefits conferred on other states upon their entering the Union.

By section 26 it is provided that schools, colleges and universities provided for shall forever remain under the executive control of the state, and that no part of the proceeds derived from sale or other disposal of granted lands for educational purposes

346

shall be used for support of any sectarian or denominational school, college or university.

Section 28 of the Enabling Act, on the questions here under consideration, is the more important section. This section as amended reads as follows:

1. "That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to said territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same."

2. "Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust." ·

3. "No mortgage or other encumbrance of the said lands, or any part thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. Said lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction to be held at the county seat of the county wherein the lands to be affected, or the major portion thereof, shall lie, notice of which public auction shall first have been duly given by advertisement, which shall set forth the nature, time, and place of the transaction to be had, with a full description of the lands to be offered, and be published once each week for not less than ten successive weeks in a newspaper of general circulation published regularly at the state capitol, and in the newspaper of the circulation which shall then be regularly published nearest to the location of such lands so offered; nor shall any sale or contract for the sale of any timber or other natural products of such lands be made save at the place, in the manner, and after the notice by publication thus provided for· sales and leases of the lands themselves; 'Provided, That nothing herein contained shall prevent said state of Arizona from leasing in a manner as the state legislature may direct, any of said lands referred to in this section for grazing and agricultural purposes for a term of ten years or less,. or from leasing any of said lands for mineral purposes (including leases for exploration of oil and gas and extraction thereof) for a term of twenty years or less.' "

4. "All lands, leaseholds, timber and other products of land, before being offered, shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the· value so ascertained, nor upon credit unless.

accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid."

5. "No lands shall be sold for less than *their appraised value,* and no lands which are or shall be susceptible of irrigation under any projects now or hereafter completed or adopted by the United States under legislation for the reclamation of lands, or under any other project for the reclamation of lands, shall be sold at less than twenty-five dollars per acre: Provided, that said state, at the request of the secretary of the interior, shall from time to time relinquish such of its lands to the United States as at any time are needed for irrigation works in connection with any such government project. And other lands in lieu thereof are hereby granted to said state, to be selected from lands of the character named and in the manner prescribed in section twenty-four of this act."

6. "*'The state of Arizona is authorized to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe: Provided, That such exchanges involving public lands may be made only as authorized by Acts of Congress and regulations thereunder.'*

7. "There is hereby reserved to the United States and excepted from the operation of any and all grants made or confirmed by this act to said proposed state all land actually or prospectively valuable for the development of water power or power for hydro-electric use or transmission and which shall be ascertained and designated by the secretary of the interior within five years after the proclamation of the President declaring the admission of the state; and no land so reserved and excepted shall be subject to any disposition whatsoever of said state, and any conveyance or transfer of such land by said state or any officer thereof shall be absolutely null and void within the period above named; and in lieu of the land so reserved to the United States and excepted from the operation of any of said grants there be, and is hereby, granted to the proposed state an equal quantity of land to be selected from land of the character named and in the manner prescribed in section twenty-four of this act."

8. "A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys was by this act conveyed or confirmed. No money shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. The state treasurer shall keep all such moneys invested in safe, interest-bearing securities, which securities shall be approved by the

governor and secretary of state of said proposed state, and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto, as defined by this act and the laws of the state not in conflict herewith."

9. "Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this act shall be null and void, any provisions of the constitution or laws of the said state to the contrary notwithstanding. It shall be the duty of the attorney-general of the United States to prosecute, in the name of the United States and in its courts, such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom."

10. "Nothing herein contained shall be taken as in limitation of the power of the state or of any citizen thereof to enforce the provisions of this act." (Italics show amendments.)

The effect of the amendments of section 28 was: first, to permit the people of Arizona to amend their Constitution, which they have done, to provide for leases for a term of 10 years, except leases for exploration of oil and gas and extraction thereof for which the term is 20 years (art. 10, sec. 3, Const., June, 1945, Cum.Pocket Supp. to A.C.A.1939, p. 17); second, to eliminate the requirement that no land should be sold for less than $3 per acre, and to permit the lands to be sold for "their appraised value"; and, third, to permit the state of Arizona to exchange land owned by it for other lands, public or private, under such regulations as the legislature may prescribe, providing exchanges involving public lands may be made only "as authorized by Acts of Congress and regulations thereunder." *To date the legislature has not prescribed any regulation for any exchange of lands.*

Article 10 of the Constitution, entitled "State and School Land" is practically a rescript of section 28 of the Enabling Act, with these two marked distinctions. The concluding phrase of the last sentence of the 8th paragraph of section 28 of the Enabling Act reads as follows: "as defined by this act and the laws of the state not in conflict herewith." This phrase is eliminated from the corresponding constitutional provision found in section 7 of article 10. Another distinction to be noted between the Enabling Act and the Constitution is found in sections 1 and 9 of article 10 of the Constitution. We shall set forth these two sections, italicizing the phrases that do not appear in the comparable sections of the Enabling Act.

"§ 1. (School lands held in trust.)—All lands expressly transferred and con-

firmed to the state by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the state and all lands heretofore granted to the territory of Arizona, *and all lands otherwise acquired by the state,* shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

\* \* \* \* \* \*

"§ 9. (Lands held under prior lease.) —All lands expressly transferred and confirmed to the state, by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the state, and all lands heretofore granted to the territory of Arizona, *and all lands otherwise acquired by the state,* may be sold or leased by the state in the manner, and on the conditions, and with the limitations, prescribed by the said Enabling Act and this constitution, and as may be further prescribed by law; Provided, that the legislature shall provide for the separate appraisement of the lands and of the improvements on school and university lands which have been held under lease prior to the adoption of this constitution, and for reimbursement to the actual bona fide residents or lessees of such lands upon which such improvements are

situated, as prescribed by title 65, Civil Code of Arizona, 1901, and in such cases only as permit reimbursements to lessees in said title 65."

The phrase "and all lands otherwise acquired by the state" appearing in sections 1 and 9 of article 10 is not incorporated in the Enabling Act. The Enabling Act has to do with lands granted to the state in trust for certain purposes. It is patent that the federal government would not and did not attempt in the Enabling Act to dictate to the state the manner of acquisition, control, management, or disposition of any lands that it might acquire in its governmental or proprietary capacity subsequent to statehood. It will be necessary in the course of this opinion to analyze these words of limitation in the Constitution wherein the people voluntarily purported to subject all lands otherwise acquired by the state to the inhibitions and limitations contained in the Enabling Act with reference to grant land.

Appellants have set forth numerous assignments of error and propositions of law which we will not enumerate. They are all grounded upon the following concept: "The Enabling Act, the supreme law, mandatorily requires the State Treasurer to keep all institutional monies invested in safe interest-bearing securities approved by the Governor and the Secretary of State and mandatorily requires that the State Treasurer at all times be under a good and sufficient bond or bonds conditioned for the

faithful performance of his duties as defined by the Enabling Act." It is the position of appellants that the state treasurer is an insurer of the funds, and being an insurer of the funds his discretion and acts may not be controlled or prescribed by legislative enactment; that the state treasurer may, without regard to any legislative direction, with the approval of the governor and secretary of state, transfer the investment of such funds from one character of investment to another, and substitute one form of property or security for another. Appellants also suggest that all legislative enactments relating to investment of institutional funds by the state treasurer, when acting with the approval of the governor and secretary of state, are ineffective, unconstitutional, and void, being in conflict with the fundamental and paramount law found in the Enabling Act and the Arizona Constitution. With this latter suggestion we are in accord. A review of the history leading up to the formulization and adoption of our Enabling Act discloses a studied effort on the part of Congress effectively to circumscribe the state in its use and disposition of the lands granted in trust to the state by the United States, as well as any proceeds derived from their sale or from sale of natural products thereof.

### Historical Approach to Adoption of Enabling Act.

Before proceeding further it is, we believe, of interest to observe that the Enabling Act for New Mexico and Arizona marked a complete and absolute departure from the enabling acts under which other states were admitted to the Union. Twenty-three of the forty-eight states were admitted without any enabling act or act of admission. Of these twenty-three, thirteen were the original states that formed the Union. The next ten appear to have simply "mushed" in. The twenty-three are Alabama, Connecticut, Delaware, Florida, Georgia, Maine, Maryland, Massachusetts, Mississsippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin.

Twenty-three states came into the Union through acts of admission, organic acts, or enabling acts. Of these twenty-three the substance of the acts is much alike, and where land was granted by the United States to the state for various purposes the acts of admission, the organic acts, or the enabling acts as passed by Congress were each specific as to the purpose for which the land was granted, but all left to the legislatures of the states full power and authority to determine how the granted lands were to be sold or leased and how and by whom the monies derived from disposition of the lands were to be kept and preserved for the purposes for which the lands had been granted. These twenty-three states are Iowa, Kansas, Kentucky, Arkansas, California, Colorado, Idaho, Illinois,

Indiana, Louisiana, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, and Wyoming. It is significant that Congress designated no one, in any of these twenty-three acts (acts of admission, organic acts, enabling acts), to keep invested funds derived from disposition of granted lands. The sad experience of Congress with the handling by these twenty-three states of the granted lands, the sale thereof, and the investment of monies derived from a disposition of the granted lands, brought about a new policy which found expression in the Enabling Act for New Mexico and Arizona. The dissipation of the funds by one device or another, sanctioned or permitted by the legislatures of the several states, left a scandal in virtually every state, and these granted lands and the monies derived from a disposition thereof were so poorly administered, so unwisely invested and dissipated, that Congress concluded to make sure, in light of experiences of the past, that such would not occur in the new states of New Mexico and Arizona. Our research discloses that the lower house of Congress passed for the admission of New Mexico and Arizona the commonly accepted form of enabling act, one in full substance like the acts under which the last-mentioned twenty-three states were admitted to the Union. When this enactment reached the Senate of the United States, Senator Beveridge of Indiana, chairman of the committee on territories, recommended that the proposed enabling act be not passed and offered as a substitute the Enabling Act under which New Mexico and Arizona were finally admitted to the Union, giving cogent reasons for the change of policy written into this Enabling Act. We do not mean to infer that all of these twenty-three acts are in the same language or even of the exact pattern, but the substance is similar, and all of the later ones are in practically the same words and gave to the legislature full power to provide for the administration of granted lands. The language used was generally the same.

We quote from the Colorado Enabling Act which grants specified lands for specific purposes: "* * * to be appropriated and applied * * *" or "* * * to be used and disposed of on such terms, conditions and regulations as the legislature shall direct * * *."

Senator Beveridge's report as chairman of the committee on territories (Senate Com. on Territories, Rep. 454, 61st Cong., 2nd Sess.), so far as pertinent, is:

"The fourth important difference between the House and Senate bills is that the former bill has no restriction regarding the disposal of the lands granted the proposed new states, whereas the latter bill places on these lands careful and rigid, though entirely reasonable and practicable, restrictions.

"The Senate bill (secs. 10 and 28) expressly declares that the lands granted and confirmed to the new states shall be held in

trust, to be disposed of only as therein provided and for the several objects specified. The same trust feature is extended to the proceeds of the granted lands. Mortgages are entirely forbidden, and the sales and leases are required to be made to the highest bidder at a public auction, after notice by advertisement, except that these formalities are dispensed with in the case of any lease for a period of five years or less.

"Appraisal is required before sale or lease, and sales or other disposition for a price less than the value so fixed or the minimum prices mentioned in the bill are forbidden, as well as transactions upon credit, unless accompanied by security.

\*　　\*　　\*　　\*　　\*　　\*

"As hereinabove indicated, it extends the trusts attaching to the lands to the funds created by their disposition and requires that each fund be kept separate by the state treasurer and that he be under bond for their safe-keeping.

"Transactions in contravention of the act are declared to be void, and it is made the duty of the Attorney-General to take such proceedings at law and in equity as may be necessary or appropriate to enforce the provisions relative to the application and disposition of the lands and the proceeds or funds derived therefrom."

The committee's report under the heading "Reasons and Precedents" says:

"In the foregoing provisions there is nothing new in principle. For many years it has been the custom to specify the purposes for which grants of lands are made to incoming states and to place express restrictions upon the mode of disposing of them." (For illustration here Senator Beveridge refers to the enabling acts of Oklahoma, Wyoming, North Dakota, South Dakota, Montana, Washington, and Utah.)

"The Senate bill, while somewhat more specific, is not notable for any marked innovation unless it be found in the express provision for its enforcement by the action of the Attorney-General. \*　\*　\*"

The report further gave as a reason for the more specific provisions in the Enabling Act for New Mexico and Arizona a recent experience in the territory of New Mexico where state officials had disposed of valuable timber lands granted under the Act of June 21, 1898, 30 Stat. 484, and in connection with which actions were pending in courts to avoid conveyances. This was but another experience resulting from leaving the legislature vested with general power to administer granted lands and proceeds derived therefrom. The experience of the past caused the Congress of the United States to lose confidence in the effectiveness of legislative control and handling of granted land.

The representatives of the people, active in securing statehood for New Mexico and Arizona, readily and willingly accepted the restrictive provisions of the Enabling Act without discussion or debate. Search of the Congressional Record reflecting all de-

bate and of committee reports having to do with adoption of the Enabling Act and admission of New Mexico and Arizona to statehood, reveals no debate and no testimony relative to the change manifested by the Enabling Act regarding the sale and leasing of granted lands and the products thereof and the investment of monies derived from granted lands, except that of the ex-governor of New Mexico, L. B. Prince, Charles A. Spiess of New Mexico, Robert E. Morrison of Arizona, Delegate Ralph H. Cameron of Arizona, and J. Lorenzo Hubbell of Arizona, all of whom testified that they were familiar with the restrictive provisions in the Enabling Act and the departure they created from the traditional policy of Congress, leaving such matters entirely to the legislatures of the states, and that they approved thereof in their entirety. Sen.Com. on Terr.Rep., supra.

This departure on the part of Congress from its traditional policy in the admission of new states, as evidenced by the provisions in the Arizona-New Mexico Enabling Act having to do with administration and sale of granted lands and investment of their proceeds, creates a new situation in consequence whereof little or no precedent exists, in acts pursuant to which other states were admitted into the Union or in decisions or legislative enactments of other states, to aid us in the proper construction of the provisions of our Enabling Act and applicable constitutional provisions.

## New Mexico Experiences and Cases Interpreting Enabling Act.

The ingenuity of politically ambitious men seeking to obtain preferment by use of trust funds derived from administration and sale of lands granted by the Enabling Act to the state of New Mexico has resulted in no dearth of cases, state and federal, arising in New Mexico. Alone, few of these decisions are helpful to us; considered together, however, they present quite a definite pattern. We may summarize these decisions by saying that together they establish that *every act of the legislature that in any manner circumvents the plain provisions of the Enabling Act is struck down as unconstitutional and void,* and there have been many relating to sale of granted lands, the use of proceeds from granted lands, the extent and nature of the trust created by provisions of the Enabling Act, and an endeavor to control the investment of institutional funds and to take away or control the discretion imposed upon the state treasurer. State v. Marron, 1913, 18 N.M. 426, 137 P. 845, 50 L.R.A.,N.S., 274; State v. Llewellyn, 1917, 23 N.M. 43, 167 P. 414, certiorari denied 245 U.S. 666, 38 S.Ct. 63, 62 L.Ed. 538; Ervien v. United States, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128; Regents of University v. Graham, 1928, 33 N.M. 214, 264 P. 953.

The effectiveness of the restrictive limitations of the Enabling Act was interpreted with marked lucidity in Ervien v. United States, supra, construing a New Mexico

statute. The New Mexico legislature enacted a law on March 8, 1915, providing in substance that the commissioner of public lands should expend three cents on the dollar of the annual income. of his office from sales and leases of lands, including lands granted by the Enabling Act, for institutional purposes and for making known the resources and advantages of the state of New Mexico generally, and particularly to homeseekers and investors. In the year ending December 31, 1914, the commissioner had received approximately three-quarters of a million dollars of permanent institutional funds, of which he proposed to use three cents on the dollar to comply with the above-mentioned legislative directive. The Attorney General of the United States sought an injunction to prevent the dissipation of the trust funds. The Supreme Court of the United States, referring to the decision of the 8th Circuit Court of Appeals, 246 F. 277, 159 C.C.A. 7, said [251 U.S. 41, 40 S.Ct. 76]: "We need not extend the argument or multiply considerations. The careful opinion of the Circuit Court of Appeals has made it unnecessary." A consideration of the opinion of the Circuit Court referred to by the Supreme Court emphasizes the exclusive nature and character of the provisions of our Enabling Act, and points out that the legislature is powerless to interfere with the state treasurer in the discharge of the discretionary duties imposed upon him in keeping the institutional funds invested in safe, interest-bearing securities. We quote from the Supreme Court opinion, Ervien case, at page 76 of 40 S.Ct., at page 130 of 64 L.Ed.:

"The case is not in broad range and does not demand much discussion. There is in the Enabling Act a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose; and to make assurance doubly sure it was provided that the natural products and money proceeds of such lands should be subject to the same trust as the lands producing the same. To preclude any license of construction or liberties of inference it was declared that the disposition of any of the lands or of the money or anything of value directly or indirectly derived therefrom for any object other than the enumerated ones should be 'deemed a breach of trust.'

"The dedication, we repeat, was special and exact, precluding any supplementary or aiding sense, in prophetic realization, it may be, that the state might be tempted to do that which it has done, lured from patient methods to speculative advertising in the hope of a speedy prosperity.

"It must be admitted there was enticement to it and a prospect of realization, and such was the view of the District Court. The court was of opinion that a private proprietor of the lands would without hesitation use their revenues to advertise their advantage and that that which was a wise administration of the property in him could not reach the odious dereliction of a breach of trust in the state.

*"The phrase, however, means no more in the present case than that the United States, being the grantor of the lands, could impose conditions upon their use, and have the right to exact the performance of the conditions."* (Emphasis supplied.)

We repeat again the words of Mr. Justice McKenna in Ervien v. United States, supra: "The dedication, we repeat, was special and exact, precluding any supplementary or aiding sense, in prophetic realization, it may be, that the state might be tempted to do that which it has done, lured from patient methods to speculative advertising in the hope of a speedy prosperity."

Permanent School Funds Lost in Arizona.

In view of the dissipation of land grants by the various states prior to the admission of Arizona and New Mexico, we submit that it was not merely prophetic to anticipate that the legislature would submit to pressure groups and enact legislation encouraging and licensing the state treasurer, governor, and secretary of state to invest the permanent funds in questionable investments, but rather it was a certainty that such attempts would be made. Prophetically or realistically, it came to pass in Arizona. The state legislature by ch. 5, Session Laws 1915, 2nd S. S., secs. 108 to 120, inclusive, declared it to be the *duty* of the state to invest any monies belonging to the permanent funds as by the act directed. Among other investments it directed that "Such moneys shall be invested in * * * first mortgages on farm lands," § 109, the loans not to exceed one third of the actual value of the land, *to be determined by an appraisal of the land commissioner, and only upon the recommendation of the land commissioner.* By section 111 it was provided that "Such loans shall only be made upon cultivated lands." This enactment was followed by an amendment to section 111 (ch. 12, Laws 1917), which provided in part that: "* * * No loan shall be made upon lands without the State of Arizona, nor on lands of which the appraised value is less than ten dollars per acre, *and when loans are made on unimproved farm lands* they shall be conditioned upon the entire amount loaned being employed, under regulations to be adopted by the Governor, Secretary of State and State Treasurer, in the improvement of the lands forming the basis of security." (Emphasis supplied.)

In 1919 the legislature by the enactment of ch. 95, Laws of 1919, amended section 109 of ch. 5, Laws of 1915, 2nd S. S., relating to the investments that were authorized to be made from the permanent funds by the state treasurer. This amendment gave the state treasurer further unsolicited and unauthorized advice as to how to invest the permanent funds. It had the effect of subjecting him to pressure groups, and lulling him into a sense of security in regard to any loans that he might make with the approval of the governor and secretary of state. This section again provided that the permanent funds should be invested in

named securities, including "first mortgages on farm lands in the State of Arizona." The amendment then provided that: " * * * All applications for loans on farm lands shall be made on blank form, to be prepared and furnished by the State Treasurer, and shall be filed with the State Treasurer, provided; that no application for a loan shall be accepted for filing by the State Treasurer unless such application is accompanied by the sworn statement of three (3) disinterested owners of land situated within the County in which the land offered as security for the loan lies, who shall set forth in said statement their estimate of the actual cash value of the land offered, together with such other information as may be required by the rules and regulations to be adopted by the State Treasurer and Commissioner. If the value of the land as fixed by the three (3) disinterested owners of land, as herein provided, is less than 200 per cent of the amount of the loan applied for the State Treasurer shall reject the application and refund the fee therefor to the applicant. If the value of the land offered as security, as fixed by the County Assessor, equals 200 per cent, or more, of the amount of the loan applied for, the application shall be by the State Treasurer transmitted to the Commissioner for appraisal and recommendation as in this act provided."

By 1925 there had been loaned from the permanent funds on first mortgages approximately two million dollars. On approximately one half million dollars of this amount the interest and principal payments had long since been in arrears. The legislature at this time attempted to tighten up and restrict the type of loan that might be made on farm lands. By ch. 64, Laws 1925, it was provided that monies loaned on first mortgages were to be limited to "improved farm lands within the State of Arizona that have been in cultivation for at least five years, and to which are attached improved water rights in an irrigation or water distributing association, * * *." Sections 108, 109, and 110, ch. 5, Laws 1915, 2nd S. S., as amended by ch. 25, Laws 1919; ch. 95, Laws 1919; ch. 100, Laws 1921; and ch. 64, Laws 1925 were consolidated and revised as section 2640, R.C.A.1928. This latter section still directed the treasurer, with the approval of the governor and secretary of state, to invest monies from the permanent funds in certain types of bonds and including first mortgages on improved farm lands. By ch. 31, Laws 1933, section 2640, R.C.A.1928, was amended, removing from the section the direction to invest the monies in first mortgages on improved farm lands and limiting any investments to be made to bonds of the United States, improvement bonds of this state, or counties, incorporated cities and towns, or school districts thereof. As further indicative of the manner in which various state treasurers, with the approval of the governor and secretary of state, have managed funds derived from institutional land grants under the Enabling Act, we call attention to the fact that, after the enactment of ch. 5,

Laws 1915, 2nd S. S., directing the treasurer to make loans on first mortgages and cloaking such loans with the legislative mantle of approbation, many loans were made in Apache County in 1918 and in subsequent years after the Lyman Dam washed out on the Little Colorado River in 1915. The state treasurer, the governor, and the secretary of state, who had been designated by the legislature as a state loan board, loaned the owners of lands under the dam $120,000, which amount was increased by subsequent loans to $629,672.66, for the purpose of reconstructing the dam. None of the monies loaned were paid directly to any individual. The money was paid over to the Lyman Water Company, a corporation, the state treasurer taking the individual notes, mortgages, and pledges of water stock of the beneficiaries of the loan. By the proxies held by him the state treasurer controlled said corporation. The company began the reconstruction of the dam under the *supervision and direction of an engineer appointed by the governor of the state.* As a result of changing administrations the supervising engineer was changed some three times. Each succeeding engineer determined that much of the work of his predecessor had been incompetently conceived and carried out, resulting in non-beneficial expenditures of the money. The legislature recognized this fact and in 1927 enacted ch. 40, Laws 1927, authorizing and directing the loan commission to compromise with the settlers under the Lyman Dam by reducing their loans to an amount equal to 50% of the original monies loaned. To compensate the permanent fund for this loss, the legislature appropriated out of the general fund, to be paid by the taxpayers of the state, the sum of $93,734.83. In Udall v. State Loan Board, 35 Ariz. 1, 273 P. 721, this court approved the constitutionality of ch. 40, Laws 1927, authorizing this compromise, and determined that the claims presented and compromised were founded in justice and equity, and did not contravene article 9, section 7 of the Constitution prohibiting donating or giving away any of the state's money.

By ch. 94, Laws 1929, the legislature amended sections 113 and 114 of ch. 5, Laws 1915, 2nd S.S. This amendment pertained to foreclosing mortgages, securing loans from the permanent funds, and for assignment of such mortgages. For purposes of carrying out the Act, the legislature appropriated $60,000 from the general fund. In 1944, the legislature in second special session enacted chapter 4, wherein an appropriation of $689,383 was made to reimburse the permanent funds for losses suffered on first mortgages on farm lands, improved and unimproved. By section 4 of the Act, the legislature directed an audit of the funds. This section directed the ascertainment of: "1. lands returned to the state through foreclosure of, or on account of indebtedness under farm loans; 2. lands so returned which have since been sold by the state loan board or other officials of the state, and 3. the status

of all accounts of lands so sold, together with unliquidated farm loans, including: 3a. the amount of indebtedness paid; 3b. the amount unpaid; 3c. the amount unpaid but not in default, and, 3d. the amount in default." In addition to the appropriation to reimburse the funds, the sum of $7500 was appropriated to the auditor for the purpose of paying the expenses of the audit and report. On Sept. 30, 1944, the auditor completed her audit and report, which purports to present a true picture of the financial transactions of the farm loans from their inception to June 30, 1944. This audit and report of the state auditor is not part of the record but we take judicial notice of the same in view of the fact that it is an official record made pursuant to the direction of the state legislature and submitted to it and the governor. See State v. Cull, 32 Ariz. 532, at page 540, 260 P. 1023. The concluding paragraph of this report is a brief summary of the farm loan transactions made by various state treasurers with the approval of the then-incumbent governors and secretaries of state. It reads as follows: "Looking at the totals on Exhibit A we find in brief the following information: The State Loan Board loaned $2,022,558.66 on 73,896.51 acres of land. Of the amount loaned $1,204,429.44 was repaid and $798,-342.40 was cancelled by quit claim deed or foreclosure, leaving a balance of $19,786.-82 due on active loans. The $798.342.40 loss by cancellation was reduced $17,879.60

by lease money received and $234,612.51 by land sales (this is the net of total sales price less cancelled sales) leaving a loss of $545,850.29. This loss is offset by 16,465.-88 acres of land received by the State through quit claims and foreclosures which is still in the State's name and can be leased or sold. Of the $234,612.51 in land sales, $123,252.14 has been paid leaving a balance due the State of $111,360.37. Interest earnings from the inception of the Farm Loans to June 30, 1944, amounted to $609,463.39."

We herewith quote an additional paragraph from this audit and report as being fairly interpretative of the situation as it existed in the past and prior to the time the legislature decided not to advise and direct the state treasurer to invest the permanent funds in first mortgage loans. "The fundamental reason for the majority of the troubles in connection with farm loans lies, in our opinion, in the framework of the State Loan Board. The Board had no members who were necessarily versed in land matters, and the only really active member of the board was the state treasurer who according to law cannot succeed himself in that office. The actual work on farm loans was performed by the farm loan secretary, who was appointed by the treasurer and therefore could hardly hope to remain in that position for more than two years. Thus the secretary had little incentive to do the necessary amount of hard ground-work to really familiarize

himself thoroughly with the thousands of details and loose ends that were always present in the farm loan files. The Board by this existing condition, was prevented from having a secretary who really had the actual years of experience with the farm loan accounts to make him an authority on farm loan matters."

Undoubtedly had it not been for legislative intermeddling in the duties of the state treasurer which had already been definitely and irrevocably fixed and prescribed in the Enabling Act, and which precluded any supplementary aid or advice from the legislature, the various state treasurers, with the approval of the governor and secretary of state, would have exercised just ordinary sound business judgment and invested the institutional permanent funds in safe interest-bearing securities rather than in first mortgages secured for the most part on "border" lands.

█ We are of the opinion that any and all enactments of the legislature are unconstitutional insofar as they attempt to restrict limit, direct, or in any degree control the action of the state treasurer, the governor, and the secretary of state in the investment of the permanent institutional funds. The legislature has no power to substitute its will and judgment for that of the treasurer, exercised with the approval of the governor and secretary of state.

### State Treasurer Not Insurer of Permanent Funds.

█ We do not agree with the proposition set forth by appellants that the state treasurer is an insurer of these permanent institutional funds; nor do we agree with his proposition that lands, title to which is acquired by the state by foreclosure of mortgages securing the investment of permanent institutional funds, are not "state lands" or "public lands" within the meaning of the Arizona Constitution; nor do we agree with his contention that the state is merely a trustee of such lands for the benefit of the state treasurer and his surety, upon the bond or bonds he, by the provisions of the Enabling Act and the Constitution, is directed to furnish.

█ We shall now attempt to set forth our reasons for reaching these conclusions. By section 28 of the Enabling Act and section 7 of article 10 of the Constitution, the state treasurer is directed to keep the monies belonging to the permanent institutional funds invested in safe, interest-bearing securities. By section 10 of article 5 of the Constitution "No person shall be eligible to succeed himself to the office of state treasurer for the succeeding two years after the expiration of the term for which he shall have been elected." By section 1 of article 5, the term of the treasurer is two years. Under this setup it would be difficult if not impossible, except where there was actual fraud or collusion to fix or lay the blame on any par-

ticular treasurer for any loss occurring on account of investment of the permanent funds. At the time of the investment, the security purchased may be absolutely sound and worth one hundred cents on the dollar, but due to unforeseen contingencies and conditions arising years later, it may have depreciated in value. If the then treasurer in the exercise of sound discretion and good judgment should dispose of it at a loss for the reason that he contemplated there might be further depreciation of the security, could it be said that he was responsible for the investment, and that he and his sureties on his bond were responsible for the loss and were insurers to the extent of the loss? Again, a bond good through the years may be redeemed at a figure less than its purchase price. Should such a loss be charged to the treasurer then in office? We think not. It must always be kept in mind that the state treasurer can make no investment of these funds without the approval of the governor and secretary of state. The veto power lies in either of these last-named officials. Herein lies the protection of the people in the absence of fraud or collusion.

The supreme court of the state of New Mexico in the case of State v. Marron, 18 N.M. 426, 137 P. 845, 852, 50 L.R.A.,N.S., 274, agreed with the contention of the attorney general of New Mexico that there is no liability of the state treasurer on his bond so long as he in good faith invests the funds within constitutional restrictions and with approval of the governor and secretary of state. In this behalf Chief Justice Roberts in a specially concurring opinion said: " * * * Some of the officers, it is true, are required to execute a bond for the faithful performance of their duties, but acts within their discretion, and within the limits of their power to act, and not corruptly or willfully done, are without the terms of the bond. * * *"

Counsel for appellants have suggested that the holding in State v. Llewellyn, 23 N.M. 43, 167 P. 414, establishes in principle that the state treasurer as the keeper of the permanent institutional funds is an insurer thereof. We do not think that this interpretation is justified. In this case under some unauthorized procedure, $75,-000 of permanent institutional funds was in the custody of the secretary-treasurer of the New Mexico College of Agriculture and Mechanic Arts, rather than in the hands of the state treasurer where it should have been. By statute the secretary-treasurer of the college was required to give bond and did give it. He deposited the money in a bank which became insolvent; the deposit was lost; and suit was brought to recover on the bond. The holding of the court was to the effect that the surety on the bond was liable for monies received by the insured under color of office without regard to the fact that the funds deposited and lost were derived from sale of lands granted to the territory of New Mexico,

and that the Enabling Act made some other official the custodian of such funds.

### Lands Secured on Foreclosure of Mortgages Not Held by State as Trustee for State Treasurer.

As heretofore stated appellants suggest that the state treasurer is an insurer of the permanent institutional funds and, as a corollary thereto, that the state is merely a trustee for the benefit of the state treasurer and his sureties in respect to any lands secured by it on foreclosure of mortgages securing loans from permanent institutional funds. With this contention we are not in accord. It must be conceded that there is no provision in the Enabling Act directing how land, title to which has been acquired at sheriff's sale on foreclosure of a mortgage, must be sold or otherwise disposed of, but it is all-important to note that by section 1 of article 10 of the Constitution all lands granted to the state by the United States "and all lands otherwise acquired by the state, shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided, * * *." Then by section 9 of article 10 of the Constitution it is provided that all lands granted to the state "and all lands otherwise acquired by the state, may be sold or leased by the state in the manner, and on the conditions, and with the limitations, prescribed by the said Enabling Act and this constitution, and as may be further pre-scribed by law; * * *." Section 10-313, A.C.A.1939 (quoted supra) is a statutory declaration of these mandatory provisions of the Enabling Act and the Constitution. It is fundamental and beyond cavil that lands granted to the state for institutional purposes are held in trust for specific uses and benefits stipulated and prescribed. For the use and benefit of the common schools, there was granted approximately 8,239,419.53 acres; for university purposes 200,000 acres; for legislative, executive, and judicial public buildings 100,000 acres; for penitentiary 100,000 acres; for insane asylums 100,000 acres; for schools and asylums for the deaf, dumb, and blind 100,000 acres; for miners' hospitals for disabled miners 50,000 acres; for normal schools 200,000 acres; for state charitable, penal, and reformatory institutions 100,000 acres; for agricultural and mechanical colleges 150,000; for school of mines 150,000 acres; and for military institutes 100,000 acres. Considering the purposes for which these lands were granted it is plain to us that the state holds these lands in trust for an ultimate governmental purpose. This statement compels us to reconsider the holding of this court in Arizona Title Guarantee & Trust Co. v. State of Arizona, 60 Ariz. 555, 142 P.2d 212, 213, and the inferences to be drawn therefrom. In that case the court had before it for consideration the constitutionality of sections 73-838 and 73-839, A.C.A.1939, authorizing and directing the board of supervisors to advertise for *four* weeks real estate within the coun-

ty held by the state by tax deed. It was alleged by plaintiff therein that said sections of the 1939 Code were void as in conflict with sections 1 and 3 of article 10 of the Constitution, which in substance provide that all grant lands and all lands otherwise acquired by the state shall be sold only at public auction after *ten* weeks' notice of sale by advertisement, etc. This court held that: "* * * tax title acquired by the state becomes vested in the state, not in its proprietary capacity but in trust for the state and for the other taxing municipalities or units within which the land is situated, with the power and obligation on the part of the state to sell the land and fairly apportion the proceeds to the state, municipal and other funds entitled thereto. We think this is decisive of the question here raised. Lands, the title to which become vested temporarily in the state through tax proceedings, are not grants to the state, nor does the state 'acquire' title thereto except in its governmental capacity as a tax collector."

 The court further pointed out that the requirements of sections 1 and 3 of article 10 of the Constitution referring to grant lands and their sale only after ten weeks' advertising "were intended to apply to lands acquired and held by the state in its proprietary capacity and not the lands acquired by the state in tax foreclosure proceedings, * * *." Clearly the inference must be that the court considered that grant lands acquired under the Enabling Act were held by the state in its proprietary capacity. Undoubtedly the conclusion reached in this case was correct. The state was holding lands acquired by tax title in its governmental capacity, *but it was not holding such lands under the trust conveyance of the Enabling Act,* nor *was it holding such lands in trust for the uses and benefits set up in the Enabling Act and the Constitution.* The state, by acquiring lands in either its governmental or proprietary capacity for specific uses and purposes and not specifically dedicated to be held in trust for the uses and benefits enumerated in the Enabling Act and the Constitution, cannot be said to be holding such lands in trust for the uses and benefits contemplated in the Enabling Act and the Constitution. The phrase "and all lands otherwise acquired by the state" appearing in sections 1 and 9 of article 10 of the Constitution are not all inclusive. These words "and all lands otherwise acquired by the state" refer to lands otherwise acquired by the state for the uses and benefits of the trust which was set up to create permanent funds for the support and maintenance of the institutions referred to in the Enabling Act. It is a matter of common knowledge that, since admission into the Union, the state has acquired much property for governmental purposes and for proprietary uses. The state has acquired many cites throughout the state for highway maintenance yards; also additional lands for fish hatcheries, hospitals, fair grounds, the university, colleges, etc. By section 34 of ar-

ticle 2 of the Constitution "The state of Arizona and each municipal corporation within the state of Arizona shall have the right to engage in industrial pursuits." There are countless pursuits that the state might engage in which would require the ownership of real estate and its management. Should the state engage in industrial pursuits it would be proceeding in its proprietary capacity, but surely any real estate acquired for the purpose of engaging in industrial pursuits should not be considered to have been "otherwise acquired" within the meaning of sections 1 and 9 of article 10 of the Constitution, and to be held in trust for the uses and benefits contemplated by the Enabling Act of the Constitution.

'"* * * In construing an act of the general assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the general assembly at the time of its passage, and courts will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the general assembly total ignorance of the subject with which it undertook to deal." Brewster v. Wooldridge, 100 Ga. 305, 307, 28 S.E. 43, 44. (Quoted with approval in Lewis' Sutherland Stat. Const., 2d Ed., vol. II, sec. 490.)

We think the object sought to be accomplished by the Congress and our Constitutional Convention justifies the construction which we have placed upon the Enabling Act and our Constitution in this respect. It is primary principle in construing statutes that an adherence to the letter must be abandoned if by such adherence the leading or primary object of the Constitution is to be defeated.

"Words and clauses in different parts of a statute must be read in a sense which harmonizes with the subject-matter and general purpose of the statute. No clearer statement has been or can be made of the law as to the dominating influence of the intention of a statute in the construction of all its parts than that which is found in Kent's Commentaries: 'In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law; from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion.' If upon examination the general meaning and object of the statute be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to that purpose. * * *" Lewis' Sutherland Stat. Const., 2d Ed., vol. II, sec. 370.

"The general terms of a statute are subject to implied exceptions founded on the rules of public policy, and the maxims of

natural justice, so as to avoid absurd and unjust consequences. * * *" Lewis' Sutherland Stat. Const., 2d Ed., vol. II, sec. 385:

By the Enabling Act, Congress attempted to create a continuing trust to provide funds, and effectively accomplished its purpose. Section 1 of article 10 of the Constitution is practically a rescript of the first paragraph of section 28 of the Enabling Act with the addition "and all lands otherwise acquired by the state." The framers of the Constitution might reasonably have contemplated that the federal government would make additional grants for the identical uses and purposes specified in the Enabling Act. They just as reasonably could have anticipated that the state would provide for additions to the trust fund, as it did by the enactment of sec. 95, ch. 5, Laws 1915, 2nd S. S., which reads: "The permanent common school fund shall consist of the proceeds of all lands that have been or may be granted to this State by the United States for the support of common schools; *of all property real or personal, that may accrue to the State by escheat or forfeiture; of all lands, money or other property given by individuals for the benefit of the common schools, unless the terms of such gift shall otherwise specifically provide; of all unclaimed shares and dividends of any corporation incorporated under the laws of this State; * * *.*" (Emphasis ours.)

■ This section has been continuously in effect and now appears as section 11-1101, A.C.A.1939. We are firmly convinced that the declaration in the Constitution that "all lands otherwise acquired by the state, shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided" is not only broad enough to include the lands in question, but the manner and reason for their acquisition reasonably compels the conclusion that they should fall into the classification as having been otherwise acquired for the uses and benefits of the trust estate and subject to its conditions.

It may be that the state in dealing with these lands acts as a proprietor when it becomes a grantor, lessor, or vendor of the natural products derived therefrom. In any event when it receives the sale price or rental fees these monies are held by it in trust and when expended for the purposes of the trust result in a government use. We think that the implication in the Arizona Title Guarantee case that *all* lands held by the state in its proprietary capacity can only be disposed of as in the Enabling Act provided should be erased, for we now entertain the opinion that the advertising and sale features of the Enabling Act refer only to lands incorporated in the trust estate or otherwise specifically acquired for the benefit of the trust estate.

Lands Acquired on Foreclosure Identified as Proceeds of Original Trust Res Belong to Trust Estate and are Subject to Conditions of Trust.

 Even in the absence of the constitutional declaration (art. 10, sec. 1) that "all lands otherwise acquired by the state, shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided," we believe that under the general law of trusts the disposition of these lands acquired on foreclosure would be controlled by the trust agreement (Enabling Act). An applicable test statement is set forth in 54 Am. Jur., Trusts, sec. 251, as follows: "A trust follows property or funds into the proceeds or product of the same, * * *." In Nelson v. Wood, 199 Ark. 1019, 137 S.W.2d 929, it was held that a trust follows a mortgage belonging to trust estate into land if mortgage is foreclosed.

In the instant case we know that the lands traded were acquired by the proceeds of the original trust res. The following text statement is apropos: "Most American courts have recognized this elementary conception with regard to the remedy of tracing, and have insisted that the cestui or successor trustee who is seeking to follow trust funds should convince the court that the *bonds, bank account, stock, realty, or other property, which the complainant desires to take from the hands of a defaulting trustee or another not a bona fide purchaser, either is part or all of the original trust property, or is property which has been produced by the original trust res through sale, barter, reinvestment or some other process.*" (Emphasis supplied.) 4 Bogert, Trusts & Trustees, § 921. Korrick v. Robinson, 20 Ariz. 323, 180 P. 446, and Jarvis v. Hammons, 32 Ariz. 444, 259 P. 886, support this view. See also 4 Pomeroy's Eq.Juris., 5th Ed., sec. 1058c; Restatement, Trusts, sec. 202.

 In Redfield v. Johnson, 159 Wash. 39, 291 P. 1077, 1078, it appeared that a trustee of funds used those funds to purchase real property. The question before the court was whether the trust funds could be followed into the real property. In passing upon the question, the court stated: "* * * And no rule is more fully recognized than the rule that a cestui que trust may follow trust funds wrongfully diverted through all its changes, and recover the fund from any property into which it has gone. * * *"

"* * * So long as the trust property can be traced and followed into other property into which it has been converted, it remains subject to the trust. *The product or substitute has the nature of the original imparted to it. * * *" 4 Pomeroy's Eq. Juris., 5th Ed., sec. 1058c, p. 148. (Emphasis supplied.)

 Applying these principles it is apparent that these lands acquired on foreclosure belonged to the trust estate and there was imparted to them all the char-

acteristics of the original trust lands. By the Enabling Act it is provided that: "Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust."

"* * * It is a familiar principle that neither a trustee nor any in privity with him can acquire any right by a breach of the trust." Metzger v. Lehigh Valley Trust, etc., Co., 220 Pa. 535, 69 A. 1037, 1038, cited with approval in Erie County v. Lamberton, 297 Pa. 406, 147 A. 86.

By applying this rule of law it is seen that Ed E. Murphy and wife, the original grantees from the state, were not bona fide purchasers and acquired no rights by their deed executed in breach of the trust. Their son Harold Murphy (one of appellants) was not a bona fide purchaser for the reason that he acquired an interest in the property by way of inheritance as an heir of his father. A purchaser of real estate is one who acquired it in some mode other than the common course of inheritance. Bl.Law Dict., p. 1467; 35 Words and Phrases, Perm. Ed., page 478; 51 C.J. 97. He was not a bona fide purchaser of the interest he acquired by purchase from his mother and the other heirs of his father for the reason that he knew the source of their title and merged these interests into his own inherited interest.

We shall now consider the appeal of appellant Ohio National Life Insurance Company. It relies on the following three assignments of error:

"1. The superior court erred in rendering judgment in favor of the appellee and against the appellants because, as a matter of law, the deed from the State to Ed E. Murphy is valid.

"2. The superior court erred in rendering judgment in favor of the appellee and against this appellant because, under all of the evidence in the case, and the law thereunto properly applicable, this appellant is an innocent mortgagee, for value, without notice of any claimed infirmity in the mortgagors' title, and entitled to protection as such.

"3. The superior court erred in rendering judgment in favor of the appellee and against this appellant because, under all of the evidence in the case, and the law thereunto properly applicable, appellee is estopped from challenging the validity of its deed to Ed E. Murphy or the validity of the mortgage from Harold Murphy and wife to this appellant."

Numerous propositions of law are submitted in support of these assignments. Our disposition of the appeal of Harold and Ruth Murphy disposes of the first assignment of error of the life insurance company.

In support of the second assignment, counsel for appellant submit this proposition of law: "Ordinarily a mortgagee has the same status as an innocent purchaser." In support of this proposition our attention is directed to the holding of this court in Phoenix Title & Trust Co. v. Old Dominion Co., 31 Ariz. 324, 253 P. 435, 59 A.L.R. 625, to the effect that a purchaser is entitled to rely upon the public records. This appellee parted with its money relying upon the recorded documents appearing in the recorder's office of Pinal County. These records disclosed that the deed in question was executed by the treasurer, governor, and secretary of state, approved as to form by the attorney general, and its sanctity purportedly testified to by its own seal. Counsel also direct our attention to Jefferson v. Childers, 189 La. 46, 179 So. 30; Bajek v. Polack, 120 N.J.Eq. 104, 184 A. 212; Brenton Bros. v. Bissell, 214 Iowa 175, 239 N.W. 14; King & Hamilton v. Mobley, 150 Ga. 256, 103 S.E. 237; F. B. Collins Inv. Co. v. Waide, 70 Okl. 191, 173 P. 835, and Landigan v. Mayer, 32 Or. 245, 51 P. 649, 651, 67 Am.St.Rep. 521. We quote from this latter case for the reason that it summarizes the holdings in the cases above referred to in support of appellant's proposition that ordinarily a mortgagee has the same status as an innocent purchaser. We quote: "* * * The doctrine is specifically stated in the headnote to Pierce v. Faunce, 47· Me. 507, that 'a mortgage is pro tanto a purchase, and the bona fide mortgagee or· assignee of the mortgage,

without notice of a prior claim, is entitled to the same protection as a bona fide grantee without notice.' See also Porter v. Green, 4 Iowa 571; [Singer] Manufacturing Co. v. Chalmers, 2 Utah, 542; and 2 Jones, Mortg., § 710. * * *."

We shall answer the second assignment of error together with the third, which is to the effect that the insurance company can rely upon the doctrine of estoppel. This appellant insists that the doctrine of estoppel is available against the state, acting in its proprietary capacity, though conceding that no act of a state officer can estop the state when functioning in its governmental capacity. See Crane Co. v. Tax Comm., Ariz., 163 P.2d 656, 163 A.L.R. 261; State Tax Comm. v. Martin, 57 Ariz. 283, 113 P.2d 640. Appellant cites many cases to the effect that the state in conducting transactions with respect to its lands acts in its proprietary capacity, and is consequently amenable to all rules of justice which it prescribes for the conduct of its private citizens in transactions with respect to their property and lands. See 49 Am.Jur., States, Territories, & Dependencies, sec. 56, p. 269, and cases cited. This court has at various times had occasion to consider the distinction between governmental function or capacity and proprietary function or capacity. We have heretofore referred to the Arizona Title Guarantee & Trust Co. case. Other cases are City of Phoenix v. Moore, 57 Ariz. 350, 113 P.2d 935; City of Phoenix v. Greer, 43

Ariz. 214, 29 P.2d 1062; City of Phoenix v. State, 53 Ariz. 28, 85 P.2d 56; City of Tucson v. Sims, 39 Ariz. 168, 4 P.2d 673; Sumid v. City of Prescott, 27 Ariz. 111, 230 P. 1103. It is interesting to note that counsel for the appellants Murphy, with equal vigor, argue that the lands in question are held by the state in its governmental capacity. As we have heretofore stated, we do not feel that a decision on the question as to whether these lands are held in a governmental or a proprietary capacity is determinative of this appeal. The state is not estopped to deny its deed against a bona fide mortgagee of its grantee where its officers were not authorized by law in the first instance to deed away its land and, as in this case, were positively prohibited from so doing without complying with the provisions of the trust agreement (Enabling Act) and the Constitution. 31 C.J.S., Estoppel, § 142 b, p. 419; 19 Am.Jur., Estoppel, sec. 166, n. 8. As explanatory of the rule just stated, we quote with approval from the case of Strand v. State, 16 Wash. 2d 107, 132 P.2d 1011, 1017, wherein it is said:

"It is true, of course, that regardless of the capacity in which the state acts, whether proprietary or governmental, the principle of estoppel will not apply to unauthorized or ultra vires acts of state officials. Gehr v. Ferry County, 179 Wash. 68, 36 P.2d 71; Brougham v. Seattle, 194 Wash. 1, 76 P.2d 1013; Bennett v. Grays Harbor County, supra [15 Wash.2d 331, 130 P.2d 1041].

"In this case the duly authorized officials of the state executed a deed to Einarsen which was plainly intended to convey the property involved as attached tidelands, after having determined that the lands were in fact attached. The determination of this question was within the line of duty of the state's officials. In fact, the commissioner was the sole person entitled to determine this question and the fact that he delegated certain administrative duties to subordinates did not make the decision less his responsibility.

"If the commissioner or his subordinates erred in determining the lands as attached, the state should not have the right many years later to come into a court of equity and set aside the acts of its officials to the irreparable injury of the citizens who acted in good faith and relied upon the assumption that the commissioner knew what he was doing. State ex rel. Washington Paving Co. v. Clausen, supra [90 Wash. 450, 156 P. 554, L.R.A.1917A, 436]; Eagles v. General Electric Co., supra [5 Wash. 2d 20, 104 P.2d 912]; Walker v. United States, C. C., 139 F. 409; Ritter v. United States, 3 Cir., 28 F.2d 265."

We are indebted to the learned trial judge for a brilliant and exhaustive exposition of the law applicable to this phase of the case. We quote:

"If, however, and again in assuming the validity of the law conferring the power of sale upon the Board and hedging it with terms for its exercise, these enactments

are mandatory upon the Board, or are jurisdictional in effect, or conditions to be performed before power vests in it to make the conveyance, then their deed is a nullity and gives rise to no rights whatever either in the grantee or in purchasers for value from him. In such a case the deed can be compared, not to the patent issued in the due course of administering the Land Office to a Homestead Entry when in reality the land covered by it was mineral in character and therefore not rightly to be granted under the Homestead Law, but to a patent, say, to the Washington Monument issued by the same officers, there being no law authorizing the grant of this national asset, or to the grant ex gratia, or by usurping the power, upon no pretext of complying with the Homestead Act, of lands subject to be denounced or appropriated by the citizen under that law.

"Or such a deed, there being no jurisdiction to make it, may be compared to a judgment of a court with no summons or pleading to support it. The invalidity would not per se appear upon the face of the judgment, for in an apt case such a judgment might be proper, and the invalidity would appear from the judgment roll or by a reference to the entire record. The elements of predicate are as essential to its validity as jurisdiction to render the particular judgment; all must concur to make it valid.

"Similarly, to make the deed good, and still assuming the legislation valid, and assuming that it is mandatory, to-wit: jurisdictional, the mere deed by the right officers but without the predicate of compliance with the statutory requisites is but a scrap of paper without life and incapable of originating rights flowing from it."

For the reasons heretofore stated, we conclude that the lands exchanged, title to which was acquired by the state by a foreclosure of mortgages securing the investment of school and institutional funds, are held in trust for the uses and benefits enumerated in the Enabling Act and the Constitution, and can be disposed of only in the manner therein provided. We hold the conveyance to Ed E. Murphy was a nullity, and that the appellant mortgagee Ohio National Life Insurance Company acquired no rights under its mortgage.

The judgment is affirmed.

STANFORD, C. J., and UDALL, J., concur.