**LAKE PLEASANT GROUP, an Arizona general partnership, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–848L.

United States Court of Federal Claims.

Dec. 20, 1994.

James T. Braselton, Phoenix, AZ, for plaintiff.

Gregory D. Page, Washington, DC, with whom was Asst. Atty. Gen. Lois J. Schiffer, for defendant.

## OPINION

MILLER, Judge.*

This case is before the court after argument on cross-motions for summary judgment. The primary issue is whether plaintiff possesses a compensable property interest for purposes of the Fifth Amendment. Plaintiff, which claims an easement by necessity over state trust lands, contends that the Government took its property without just compensation when the Government requested that the State of Arizona relinquish certain state trust lands, including plaintiff's

purported easement, pursuant to a federal statute. The existence of plaintiff's property interest hinges on whether certain bodies of federal and state law, specifically the New Mexico–Arizona Enabling Act and Arizona Constitution, preclude recognition of common-law principles governing easements by necessity. Assuming no such preclusion, the issue becomes whether plaintiff satisfies the requirements of an easement by necessity.

## FACTS

The following facts are undisputed, except where noted. On December 31, 1986, Lake Pleasant Group ("plaintiff"), an Arizona general partnership with its principal place of business in Maricopa County, Arizona, purchased approximately 244 acres located in the environs of the Lake Pleasant Regional Park, Maricopa County. Because of topographical constraints, the property is divided into two parcels, which, for purposes of this opinion, shall be referred to as the north and south parcels, consisting of approximately 84 and 160 acres, respectively. Plaintiff planned to construct a hotel, restaurant, convenience food store, and boat storage/repair facility on the north parcel and a single-family residential development on the south parcel. The issue of access to the north parcel forms the basis of plaintiff's complaint. The following is a chronological summary of the events relevant to plaintiff's takings claim.

1. *The history of the New Mexico–Arizona Enabling Act*

In 1910 Congress enacted the New Mexico–Arizona Enabling Act, Pub.L. No. 219, ch. 310, 36 Stat. 557 (the "Enabling Act" or the "Act"), sections 19 through 35 dealing exclusively with the proposed state of Arizona. The Enabling Act authorized the residents of the respective territories to form state governments and also granted both New Mexico and Arizona certain lands to be held in trust for the use and benefit of specified public activities. These lands are commonly referred to as the state trust lands.

*Judge Miller was confirmed as Christine Cook Nettesheim.

Section 28 of the Enabling Act contains explicit restrictions for the disposal of state trust lands: "[A]ll lands ... granted ... shall be ... held [by the state] in trust, to be disposed of in whole or in part only in [the] manner as ... provided [by the Act] and for the several objects specified in the respective granting ... provisions...." Inclusion of these restrictions distinguishes the Act from former Enabling Acts, whereby Congress had given full authority to state governments to administer the granted lands and the funds derived therefrom. Recognizing that its failure to include restrictions on the disposal of granted lands had resulted in poor land administration and unwise fund investment, Congress included the requirements in section 28 both to circumscribe the authority of the Arizona state government and to ensure that the designated trust fund received appropriate compensation for the lands.[1]

Under the Act's requirements, trust lands must be appraised prior to disposal, and the state must receive compensation of an amount not less than the appraised value. Such compensation is then distributed to the appropriate trust fund, based on the specific land-granting provision at issue. Section 28 further provides that the trust "lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction...." An auction must be advertised in accordance with the terms of the Act, except for specified short-term leases.

In 1911 the people of Arizona accepted the terms of the Enabling Act, including the land grant provisions, by ratifying art. XX, ¶ 12 of the Arizona Constitution. *See* Ariz.Const. art. X, § 1 (requiring that granted lands be disposed of as provided in the Enabling Act). The Enabling Act thereby became the organic law of the state of Arizona, which could not be altered or amended absent an act of Congress.

## 2. *The property at issue: the history of ownership and access rights*

In 1965 the Arizona State Land Department (the "SLD"), the entity responsible for managing the state trust lands, conveyed a land-locked parcel of state trust land to plaintiff's predecessors in interest. Both plaintiff and defendant agree that, from August 1973 to 1983, plaintiff's predecessors in interest possessed Right-of-Way No. 23127 (the "Arizona Right-of-Way"), issued by SLD, which connected the subject property with state Route 74, the principal access highway in the general vicinity of the property at issue.

According to plaintiff, this right-of-way was only "a 'paper' right" because its predecessors in interest, who purchased the property solely for investment purposes, never constructed a roadway to facilitate vehicular ingress and egress. Plf's Answers to Interrogs. No. 26, Apr. 26, 1994. Although plaintiff's predecessors had no immediate need to use the Arizona Right-of-Way, plaintiff maintains that this fact does not mean, as defendant contends, that "[p]laintiff's predecessors ... had no immediate need to use Route 74." Def's Prop. Findings, July 15, 1994, ¶ 5 (citations omitted). Plaintiff asserts that the need to access Route 74 existed from the date on which the SLD originally conveyed the landlocked property in 1965.

Once the Arizona Right-of-Way expired on August 31, 1983, plaintiff's predecessors did not renew the route because the United States Department of Interior Bureau of Reclamation (the "BOR") had condemned the tract of land connecting the subject property to the expired Arizona Right-of-Way. Both parties agree that this condemned land is not at issue in the case. Plaintiff's predecessors then communicated with the United States Department of Interior Bureau of Land

---

1. As the Supreme Court noted in *Lassen v. Arizona ex rel. Arizona Highway Dep't,* 385 U.S. 458, 463–64, 87 S.Ct. 584, 587, 17 L.Ed.2d 515 (1967):

   The central problem which confronted the [Arizona Enabling] Act's draftsmen was ... to devise constraints which would assure that the trust received in full fair compensation for trust lands. The method of transfer and the transferee were material only so far as necessary to assure that the trust sought and obtained appropriate compensation.... All the restrictions on the *use and disposition* of the trust lands, including those on the powers of sale and lease, were.... [included in response to a] fear that the trust would be *exploited for private advantage....*

   (Emphasis added.)

Management (the "BLM") regarding the possibility of obtaining an access route over property administered by the BLM. In June 1986 the BLM rejected the proposed route. On April 18, 1986, plaintiff's predecessors filed a formal application with the SLD, seeking a permanent right-of-way from the north parcel across certain state trust lands to Route 74. Defendant refers to this route as the "ROW corridor." [2]

In purchasing the property on December 31, 1986, plaintiff assumed the rights of its predecessors in interest with regard to the pending ROW corridor application and thereby continued to seek SLD approval of the permanent easement over the state trust lands. The Ticor Title Insurance documents dated December 29, 1986, pertaining to the 1986 sale, defined the responsibilities of the buyer and seller with respect to the ROW corridor application. Specifically, these documents provide that "the seller's [plaintiff's predecessors'] sole responsibility shall be to process an application leading to the granting of an access road to the property...." and that the "buyer's [plaintiff's] responsibility ... [shall be] to ... process said application and to pay any funds required to purchase access from the.... [SLD]."

Plaintiff contends that Barbara Burg, an SLD official, repeatedly assured plaintiff that there would be no problems in obtaining the requested access route over the ROW corridor. Gil Cyphert, one of plaintiff's general partners, attests that plaintiff purchased the property, in large part, based on the assurances of Ms. Burg.

In a letter dated January 20, 1987, Ms. Burg informed plaintiff that although it would continue processing the ROW corridor application, the SLD preferred that plaintiff gain access to Route 74 via lands adminis-

tered by the BLM. Ms. Burg also indicated the possible execution of a lease, as opposed to sale, agreement for the ROW corridor. Ms. Burg further informed plaintiff of the requirements necessary to execute the lease, including the property appraisal, which must be approved by the SLD Commissioner, and public notice and auction. See Enabling Act § 28, 36 Stat. 574; Ariz. Const. art. X, §§ 3–4.

The Secretary of Interior informed the cognizant Arizona state official that certain state trust lands retained by the state, including the ROW corridor, must be relinquished to the United States pursuant to section 28 of the Enabling Act.[3] The federal Government needed the property to implement the Central Arizona Project, pursuant to which the Tucson Aqueduct and New Waddell Dam would be constructed and maintained.

On August 20, 1987, in anticipation of rendering the quitclaim deed to the United States, the SLD filed an order stating that "no applications ... [would] be accepted for surface ... leases, permits, sales or exchanges, except renewal applications...." Defendant contends that plaintiff's application for the ROW corridor constituted a new, as opposed to renewal, application because the only other access route that plaintiff's predecessors possessed, i.e., the Arizona Right–of–Way, concerned a different tract of land. Thus, defendant argues that the order both suspended the processing of plaintiff's application and prohibited the SLD from accepting the application.

Plaintiff, in contrast, interprets the order as prohibiting only new applications, which it defines as those applications submitted after August 20, 1987. Because plaintiff's applica-

---

**2.** Plaintiff disputes defendant's contention that its predecessors requested "access to Route 74 through the ROW corridor." Def's Prop. Findings ¶ 9. Plaintiff maintains that this corridor does not connect directly to Route 74. Instead, the corridor is "'a curvilinear strip of land that extends [north] from the north boundary of the LPG [or plaintiff's] Property ... to Lake Pleasant Park Road'"—a road which connects the ROW corridor to Route 74. Plf's Statement of Genuine Issues, Aug. 17, 1994, ¶ 9 (quoting Plf's Answers to Interrogs. No. 26, Apr. 26, 1994). Al-

though the court acknowledges this discrepancy, it will employ the term ROW corridor for purposes of evaluating plaintiff's takings claim, given that both parties used the term in briefing and during argument. The parties do not dispute that the land comprising the ROW corridor is a parcel of land distinct from that involved under the expired Arizona Right-of-Way.

**3.** The record does not reflect the date on which the state official received this notification.

tion was submitted in 1986, plaintiff maintains that the order did not suspend its application and that the SLD possessed authority to process and accept the application.

On November 16, 1987, the state of Arizona complied with the Secretary of Interior's request and issued a deed of relinquishment, quitclaiming the state trust lands, including the ROW corridor to the United States, which, in turn, divided the lands between the BOR and BLM. In accordance with section 28 of the Enabling Act, Arizona received equivalent lands in exchange.

The SLD did not notify plaintiff of this relinquishment deed. Plaintiff contends that for over "four ... years after the Deed was issued, the official records maintained by SLD ... [made] no reference to the Deed." Plf's Br. filed Aug. 17, 1994, at 5. With no knowledge of the deed, plaintiff continued to pursue its application for the ROW corridor. The SLD also continued to process the application.

Approximately 6 months after the deed of relinquishment, on May 23, 1988, the SLD issued an "Authorization of Sale, Right of Way," indicating that the right-of-way described in plaintiff's application, *i.e.*, the ROW corridor, would be sold "to the highest and best bidder at public auction" and that such sale would be conducted "according to the provisions of the law."[4] Plaintiff interprets this action as the SLD's approval of its application for a permanent easement. Defendant, however, argues that the August 20, 1987 order prevented the SLD from accepting plaintiff's application. Defendant further argues that although the SLD issued the Authorization of Sale, the SLD never held the public auction required by the Enabling Act because the 1987 order precluded it from doing so.

Plaintiff contends that, upon receiving the Authorization of Sale, it requested that the SLD postpone the auction until such time as plaintiff could ascertain the new location of the Lake Pleasant Park Road, which was being relocated due to the New Waddell Dam construction. Unaware of the relinquishment deed of November 16, 1987, Ms. Burg again assured plaintiff as to the availability of the desired right-of-way.

In April 1991 Ms. Burg finally informed plaintiff of the 1987 relinquishment, which included the ROW corridor. Once plaintiff learned of this action, it applied on February 12, 1992, to the BOR requesting access to Route 74 over the agency's newly acquired land. The BOR denied plaintiff's request on the basis that it was incompatible with proposed government construction.[5]

Defendant asserts that "Arizona never conveyed [any interest in] the ROW corridor ... to either plaintiff or its predecessors by deed, lease, contract, or any other document in the land records...." Def's Br. filed July 15, 1994, ¶ 5. Plaintiff does not disagree, but, rather, maintains that the SLD in 1965 sold the land-locked property to plaintiff's predecessors "with the understanding that the access to the property was across t[he] ... [ROW] corridor." Transcript of Proceedings, *Lake Pleasant Group v. United States*, No. 92–848L, Oct. 18, 1994, at 33–34 (hereinafter "Tr."). Plaintiff contends that since 1965, it and its predecessors have "had a continuing right, under Arizona law, to a means of reasonable vehicular access to the ... property." Plf's Statement of Gen. Issues, Aug. 17, 1994, ¶ 6. Plaintiff further argues that the fact that its access right was not embodied in a written document has no relevance.

4. The appraisal report, approved by the SLD Commissioner on February 25, 1988, indicated that the right-of-way specified in plaintiff's application would be sold at public auction for a price exceeding $222,000.00.

5. On December 22, 1993, plaintiff again requested a right-of-way across lands administered by the BOR; this request was denied on February 18, 1994, for the same reasons as plaintiff's earlier request. In the denial letter, the BOR noted that two alternate access routes to the north

parcel of plaintiff's property exist, one of which was over BLM lands and the other over state trust lands. According to the BOR, "[e]ither of the[se] alternative routes ... would provide ... access which is viable and which would meet ... [plaintiff's] apparent vehicular and other transportation objectives...." Plaintiff never commented, in briefing or during argument, on the viability, or lack thereof, of these alternate routes.

Plaintiff filed a complaint in the United States Court of Federal Claims on December 15, 1992, alleging a taking of its property without just compensation. Plaintiff seeks compensation in the amount of $3 million, as well as court costs and attorneys' fees. Defendant moved for summary judgment; during argument plaintiff's opposition was treated as a cross-motion. Plaintiff has also filed suit in Arizona state court, alleging both takings and tort claims.

## DISCUSSION

Although "[t]he fact-intensive nature of just compensation jurisprudence to date ... argues against precipitous grants of summary judgment ..., there ... [are] cases in which the United States as the moving party is 'entitled to judgment as a matter of law, and where it is quite clear what the truth is....'" *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Because the parties do not dispute material facts, this is an example of such a case.

### 1. *Takings*

■■■ For a takings claim to succeed under the Fifth Amendment, under either a physical invasion or regulatory takings theory, a claimant must first establish a compensable property interest. *Lucas v. South Carolina Coastal Council*, — U.S. —, —-——, 112 S.Ct. 2886, 2899–2900, 120 L.Ed.2d 798 (1992); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979); *Preseault v. United States*, 27 Fed.Cl. 69, 84 (1992), *appeal docketed*, No. 93–5067 (Fed.Cir. Jan. 28, 1993); *see also Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978) (noting that courts dismiss takings claims where "the challenged government action ... d[oes] not interfere with interests that ... [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes") (citations omitted). Once this property interest is established, the court must determine whether the governmental action effects a "taking" of that interest, which requires analysis of "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (citations omitted).

The primary issue is whether plaintiff holds a compensable property interest. In order to make this determination, the court must evaluate plaintiff's "bundle of rights" as of the time it acquired the property at issue, which in this case was 1986. *Lucas*, — U.S. at —, 112 S.Ct. at 2899; *Preseault*, 27 Fed.Cl. at 87. The court must also examine "'existing rules or understandings that stem from an independent source such as state law' ... [because such laws] define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) Amendments." *Lucas*, — U.S. at —, 112 S.Ct. at 2901 (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (citations omitted)); *see Preseault*, 27 Fed.Cl. at 87 (ruling that *Lucas'* approach for determining the existence of a compensable property interest applied to cases concerning regulations that cause or authorize physical invasions). This court in *Preseault* held that the Supreme Court did not restrict its property rights approach in *Lucas* only to those limitations derived from state property and nuisance law and that the approach also applied to existing federal laws. 27 Fed.Cl. at 88–89. Thus, the evaluation of plaintiff's purported property interest requires an examination of the limitations in state and federal law that inhere in plaintiff's title.

### 2. *The nature of plaintiff's property interest*

Notwithstanding that plaintiff's complaint and discovery responses primarily addressed the SLD application submitted in 1986 for a perpetual easement across the ROW corridor and the corresponding actions of the SLD and federal Government, plaintiff argues that, when it purchased the property in 1986, it possessed a right of access across certain state trust lands pursuant to the common-law

theory of an easement by necessity. Plaintiff maintains that this easement arose by operation of state law when the SLD sold a land-locked parcel of state trust land to plaintiff's predecessors in 1965. Plaintiff further contends that, in accord with common law, the easement passed appurtenant to the property with each conveyance of the subject land.

In terms of the location of the easement, plaintiff asserted during argument that it "ha[d] learned recently, in further discovery in the state case, ... that ... [the subject property] was sold [in 1965] with the understanding that the access to the property was across th[e] ... [ROW] corridor," the exact same parcel of land involved in plaintiff's SLD application for which plaintiff was willing to pay over $220,000.00 to comply with the terms of the Enabling Act. Tr. at 33–34. Thus, according to plaintiff, its compensable property interest rests on the existence of an easement by necessity stemming from the 1965 sale, which passed appurtenant to the land and consisted of the ROW corridor.

The validity of plaintiff's theory hinges on whether its property interest constitutes a "stick" in its "bundle of rights." *Lucas,* — U.S. at — – —, 112 S.Ct. at 2899–2900. In order to answer this question, the court must identify plaintiff's reasonable expectations at the time that it acquired the property in 1986 in light of the limitations in both federal and state law—specifically the Enabling Act and Arizona Constitution—that inhere in its title. *Lucas,* — U.S. at — – —, 112 S.Ct. at 2899–2901; *Preseault,* 27 Fed.Cl. at 87.

■ It must first be resolved whether the Enabling Act supersedes common-law concepts of an easement by necessity, thereby negating plaintiff's purported property right.[6] During argument the court requested additional briefing on this subject. Since the parties identified no directly instructive precedent, the court turns to the provisions of the Enabling Act for an answer to this issue of seeming first impression.

Section 28 of the Enabling Act provides:

*Disposition of any of said lands* ... in any manner contrary to the provisions of this Act, shall be deemed a breach of trust.

No mortgage *or other incumbrance* of the said lands, or any thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever....

. . . .

Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act *shall be null and void,* any provision of the constitution or laws of the said State to the contrary notwithstanding.

36 Stat. 574–75 (emphasis added); *see* Ariz. Const. art. X, §§ 2–3, 8.

Although an easement by necessity that arises by operation of law does not fall squarely within the terminology "sale," or "conveyance," it does constitute an "incumbrance." 36 Stat. 574. Moreover, although the incumbrance arises by operation of law and is not an incumbrance akin to a "mortgage," section 34 of the Enabling Act plainly intends that its restrictions reach all manner and mode of ownership and alienation of the affected lands. Indeed, section 34 provides that "all laws of said Territory in force at the time of its admission into the Union shall be in force in said State until changed by the legislature of said State, *except as modified or changed by this Act or by the constitution of the State...*." 36 Stat. 578 (emphasis added).

Given the reach of section 28, the court interprets that provision in conjunction with section 34 to mean that the Enabling Act with its restrictions concerning the "[d]isposition of any ... [trust] lands" supersedes

---

**6.** The issue posed by plaintiff's property rights theory is a pure question of law. The facts in dispute, as identified above, do not pertain to this issue. Instead, these facts concern plaintiff's 1986 SLD application for a permanent easement across the ROW corridor and the corresponding actions of the SLD and federal Government. Because plaintiff does not define its property right as the right-of-way it sought pursuant to the SLD application, these facts are immaterial to the disposition of this case.

common-law property rights, such as an easement by necessity. *See Asarco Inc. v. Kadish*, 490 U.S. 605, 627, 109 S.Ct. 2037, 2050–51, 104 L.Ed.2d 696 (1989) (noting that "[t]he grant of all lands under the Enabling Act is conditioned, by the statute's clear language, upon the specified requirements for leasing or selling those lands...."); *Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 463, 87 S.Ct. 584, 587, 17 L.Ed.2d 515 (1967) (stating that "[a]ll the restrictions on the *use and disposition* of the trust lands, including those on the powers of sale and lease, were" included to avert private exploitation of trust lands) (emphasis added); *Campana v. Arizona State Land Dep't*, 176 Ariz. 288, 860 P.2d 1341, 1344 (Ct.App.1993) (stating that the Enabling Act "prohibits [the] sale, conveyance *or encumbrance* of any part of school trust lands except to the 'highest and best bidder' at a public auction") (quoting section 28 of the Enabling Act) (emphasis added); *see also* Ariz. Const. art. X, § 1 (stating that "all lands ... granted to the Territory of Arizona ... shall be by the State accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this Constitution...."). If the Enabling Act were interpreted not to reach interests that pass by operation of common law, as adopted by the state, the scheme put in place by the Enabling Act would be defeated. The Enabling Act, directly and by implication, sought to block both the creation and operation of all property interests that could impede the effectiveness of the Act.

Since plaintiff possesses no compensable property interest, the only such interest that plaintiff conceivably could claim in the ROW

corridor would be based on either plaintiff's or its predecessors' compliance with the purposes and conveyancing requirements of the Enabling Act. As discussed *infra* at pp. 437–39, plaintiff has not sustained its burden of proof on this issue.

■ Even without interpreting sections 28 and 34 of the Enabling Act as superseding the common law governing easements by necessity, plaintiff's purported property interest is not recognized if it contravenes the express purposes and requirements of the Enabling Act, as embodied in the Arizona Constitution. *See Lucas*, —— U.S. at ——, 112 S.Ct. at 2901 (holding that preexisting state laws define the range of a claimant's property interests for purposes of the Fifth Amendment); *Preseault*, 27 Fed.Cl. at 88–89 (interpreting *Lucas* approach to apply to federal laws); *M & J Coal Co. v. United States*, 30 Fed.Cl. 360, 367 (1994) (following *Lucas* and *Preseault* approaches to defining property). The record reflects that Congress enacted the Enabling Act in 1910; the people of Arizona ratified the provisions of the Act in their Constitution in 1911; and plaintiff's predecessors purchased the subject property from the SLD in 1965. *See* Ariz. Const. art. XX, ¶ 12 (stating that [t]he State of Arizona and its people hereby consent to all ... the provisions of the Enabling Act ... concerning the lands thereby granted...."). Given this chronology, plaintiff cannot dispute that plaintiff and its predecessors had knowledge of the purposes and requirements of the Enabling Act. Moreover, the record illustrates that plaintiff and its predecessors understood these requirements and even attempted to comply with them.[7]

---

7. On April 18, 1986, plaintiff's predecessors filed an application for a perpetual easement with the SLD, stating their desire to *"establish[ ] legal access* to [the] land described [therein, *i.e.,* the ROW corridor]." (Emphasis added.) In the application plaintiff's attorney also answered the question "Does the private property have access?" in the negative. These statements may be read as an admission by plaintiff that as of 1986 it possessed no right of access to the subject property. The Ticor Title Insurance documents dated December 29, 1986, pertaining to the 1986 sale, further support this conclusion. These documents state that "the seller's [plaintiff's predecessors'] sole responsibility shall be to process an application *leading to the granting of an access*

*road* to the property....," and that the "buyer's [plaintiff's] responsibility [shall be] to ... process said application and *to pay any funds required to purchase access* from the.... [SLD]." (Emphasis added.)

·Throughout discovery, plaintiff asserted that "[i]f ... [it] had been granted the access ... [by the SLD across the ROW corridor, it] could have developed the North Parcel...." Plf's Answers to Interrogs. No. 13, Apr. 26, 1994. Plaintiff also admits that it never "applied for any permits, licenses or approvals with regard to any possible development of the ... Property because, *a prerequisite* for any such development, *is receiving the necessary vehicular access route from the re-*

One of the purposes of the Enabling Act was "to produce a fund, *accumulated by [the] sale and use of the trust lands*, with which the State could support the public institutions designated by the Act." *Lassen*, 385 U.S. at 463, 87 S.Ct. at 587 (emphasis added). The restrictions included in section 28 concerning land disposal were designed to ensure "that the Act's designated beneficiaries 'derive[d] the full benefit' of the grant." *Id.* at 468, 87 S.Ct. at 589–90 (quoting H.R.Rep. No. 152, 61st Cong., 2d Sess. 3 (1910)). In *Lassen* the Court confirmed the importance of this purpose, holding that even when the state seeks an easement or right-of-way over state trust lands for purposes of building a highway, the state must pay full value for the use of the lands. *See Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 302–03, 96 S.Ct. 910, 915–16, 47 L.Ed.2d 1 (1976) (ruling that "[t]he Court's concern for the integrity of the conditions imposed by the [Enabling] Act ... has long been evident"); *Ervien v. United States*, 251 U.S. 41, 47, 40 S.Ct. 75, 76, 64 L.Ed. 128 (1919) (holding that the "Act [includes] a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose....").

To further this purpose, Congress included various conveyancing restrictions. For example, section 28 requires that "[a]ll lands, leaseholds, timber, and other products of land ... be appraised ... and [that] no sale or other disposal ... be made for a consideration less than the [appraised] value...." 36 Stat. 574; *see* Ariz. Const. art. X, § 4; *see also Lassen*, 385 U.S. at 466, 87 S.Ct. at 588 (ruling that "[t]he Enabling Act unequivocally demands ... that the trust receive the full value of any lands transferred from it....");

*Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 790 P.2d 242, 244 (1990) (holding that state trust land cannot be disposed of unless the land is appraised and the state receives appropriate consideration); *Murphy v. State*, 65 Ariz. 338, 181 P.2d 336, 353–54 (1947) (same). The Enabling Act further requires that the trust lands not be sold or leased "except to the highest and best bidder at a public auction...." Enabling Act § 28, 36 Stat. 574; Ariz. Const. art. X, § 3. This auction must be advertised in accordance with the requirements of the Act, except in cases of certain short-term leases. Any disposal of land contrary to these restrictions "shall be null and void" and "deemed a breach of trust." *Id.* at 575; Ariz. Const. art. X, §§ 2, 8.

■ Surprisingly, plaintiff concurs with the conclusion that the purposes of the Enabling Act control whether it has a compensable property interest. Plaintiff states that "provided ... that the trust receives full compensation for the interests conveyed, the requirements of the Act are satisfied...." Plf's Br. filed Nov. 2, 1994, at 2. Plaintiff, however, has not sustained its burden of proof in establishing that such compensation in fact was rendered by plaintiff's predecessors in 1965 for the ROW corridor.[8] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (holding that summary judgment is appropriate where the nonmoving party has no evidentiary support for an essential element on which it bears the burden of proof).

Plaintiff flatly states that "*the trust fund was fully compensated*" when the SLD transferred the land in 1965. Plf's Br. filed Nov. 2, 1994, at 2 (emphasis in original):

---

sponsible governmental authority(ies)." *Id.* at No. 21 (emphasis added); *see* Compl. filed Dec. 15, 1992, ¶ 7 (stating that plaintiff sought but was unable "to obtain the necessary governmental approvals for vehicular access to the North Parcel since ... 1986").

Finally, plaintiff asserts that "[d]efendant must compensate ... [it] for the elimination of its common law 'way of necessity' *that was about to manifest itself* in the form of a perpetual lease to the ROW corridor when Defendant intervened to preclude the issuance of the lease." Plf's Br. filed Aug. 17, 1994, at 15 (footnote omitted). Each of these statements illustrates that as of

1986, when plaintiff acquired the subject property, it possessed *no right of legal access* to the property. Despite these statements the court proceeds to determine whether the purposes and requirements of the Enabling Act and Arizona Constitution preclude recognition of plaintiff's purported easement by necessity.

8. Because plaintiff admits that it rendered no compensation for the ROW corridor, the critical issue is whether plaintiff's predecessors complied with the purposes of the Act by rendering compensation for the corridor.

Although extensive research in the records of the Arizona State Land Department has failed to locate the original appraisal, *it is reasonable to conclude that the appraisal was based on the assumption that there was a legal means of access to the property.* If so, the amount of compensation that the state then received as a result of the auction was (at a minimum) payment in full for a parcel of land that was understood to enjoy legal access.

*Id.* at 4 (emphasis added).

Plaintiff's proof consists of nothing more than the unsupported assertions of its counsel. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *see also Levi Strauss & Co. v. Genesco, Inc.,* 742 F.2d 1401, 1404 (Fed. Cir.1984) (holding that mere assertions by counsel that a factual dispute exists are insufficient to avoid summary judgment). The record is devoid of any evidence as to the 1965 sale, such as a copy of the deed, the price paid for the parcel, or the price of other parcels sold by the SLD during that time period. Without any evidence concerning the 1965 sale, the court cannot make the inference of payment requested by plaintiff. The only evidence of record concerning the value of the ROW corridor is the appraisal report associated with plaintiff's 1986 SLD application for a permanent easement across the ROW corridor, which indicated that the

value of the corridor exceeded $220,000.00. Plaintiff concedes that this amount was never paid.

To bolster its position, plaintiff advances an economic-based argument. Plaintiff maintains that allowing the state, acting through the SLD, to sell parcels of land without an access route "will inevitably ... chill[ ]" future bidding, thereby resulting in less money for the trust funds. Plf's Br. filed Nov. 2, 1994, at 3. Such a result, according to plaintiff, "is antithetical to the 'sole object' of the State Trust Fund." *Id.* Without evidence as to the price of the property sold in 1965, the court cannot determine the validity of plaintiff's argument. It is possible that the SLD sold the land to plaintiff's predecessors at a price that reflected the lack of an access route. Selling at a discounted price would not "chill" future bidding, because the lack of access would be built into the fair market value of the property.

Because plaintiff has adduced no evidence indicating that its predecessors or it ever compensated the state for the lands comprising the ROW corridor, the purposes of the Enabling Act have not been satisfied.[9] The court cannot compensate plaintiff for a property right that contravenes the purposes of preexisting federal and state laws, especially when these laws existed for over 50 years

---

9. Defendant also argues that plaintiff's easement by necessity cannot exist because it contravenes the express public notice and auction requirements of the Enabling Act. Plaintiff disagrees, arguing that these requirements apply only to sales or leases and not to common-law concepts of an easement by necessity. Plaintiff, however, does not dispute the relevance of the appraisal requirement of the Act.

Plaintiff cites *Lassen* for the proposition that when the trust is compensated for an easement, the public notice and auction requirements do not apply. The court declines to read *Lassen* this broadly. Defendant correctly notes that *Lassen* held only that where the state seeks state trust lands for purposes of performing a proprietary function, such as building a highway, the state must compensate the trust fund, but need not comply with the conveyancing requirements. The Court noted that Congress included the public notice and auction requirements concerning the sale or lease of land "to the highest and best bidder," as provided in the Enabling Act, to avoid *"private sales* at unreasonably low prices." 385 U.S. at 464, 87 S.Ct. at 587 (emphasis add-

ed). The Court therefore held that the restrictions should not apply to the state, because the restrictions targeted exploitation of trust lands for private, not public, advantage. The Court further held that requiring the state to follow the conveyancing procedures "would [be to] sanction an empty formality;" even if another bidder claimed the property, the state could later condemn that same property, "leav[ing] the auction [requirement] without any real significance." *Id.*

Arguably, the public notice and auction restrictions apply in this case, given that Congress included the restrictions to prevent private exploitation of state trust lands. *See Asarco,* 490 U.S. at 627, 109 S.Ct. at 2050–51 (stating that "[t]he grant of all lands under the Enabling Act is conditioned, by the statute's clear language, upon the specified requirements for leasing or selling those lands...."). The court finds it unnecessary to resolve the applicability of these requirements in light of plaintiff's concession that the state must be compensated for the trust lands in order to satisfy the purposes, as well as the appraisal requirement, of the Act.

prior to the time when plaintiff's predecessors purchased the property at issue, and when plaintiff and its predecessors attempted to comply with these laws.[10] In addition, compensating plaintiff would perpetuate the very abuses the drafters of the Enabling Act sought to prevent. *See infra* note 1.

### 3. *Common-law concepts regarding easements by necessity*

■ Even assuming, *arguendo,* that the requirements of the Enabling Act and Arizona Constitution do not preclude recognition of an easement by necessity, plaintiff still has no compensable property interest because it has failed to satisfy the requirements for such an easement. An easement by necessity arises by implication of law where the grantor sells land without an outlet. *Bickel v. Hansen,* 169 Ariz. 371, 819 P.2d 957, 960 (Ct.App.1991). The law implies a right of access over the grantor's property to ensure that the grantee has reasonable access to his property. This common-law principle derives from the long-standing rule of "public policy that lands should not be rendered unfit for occupancy or ... cultivation...." *Pritchard v. Scott,* 254 N.C. 277, 118 S.E.2d 890, 894 (1961); *see Bickel,* 819 P.2d at 960; 28 C.J.S. *Easements* § 35 (1941); 25 Am. Jur.2d *Easements and Licenses* § 35 (1966).

■ To establish an easement by necessity, the party claiming the property right must prove unity of ownership of the dominant and servient tenements, a subsequent severance of the estates, and a reasonable necessity at the time of severance. *Bickel,* 819 P.2d at 960. Defendant notes that

> [e]ven where each of the elements of "the common law easement by necessity doctrine" are met, that fact "does not of itself establish the easement. This Court must look to the intent of the parties to the conveyance and the purposes of the conveyance. In this case, that is ascertained by looking to the purposes of the [Congressional] land grant."

Def's Br. filed Sept. 1, 1994, at 8 (quoting [second quotation] *Montana Wilderness Ass'n v. United States Forest Service,* 496 F.Supp. 880, 885 (D.Mont.1980) (citations omitted), *aff'd and remanded on other grounds,* 655 F.2d 951 (1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *see Superior Oil Co. v. United States,* 353 F.2d 34, 37 (9th Cir.1965) (noting that implication of an easement by necessity depends on the surrounding circumstances and terms of the grant); *Jackson v. Nash,* 866 P.2d 262, 268–69 (Nev.1993) (same); *Pritchard,* 118 S.E.2d at 894 (same); 28 C.J.S. *Easements* § 35 (stating that "the implication [of an easement by necessity] will not be made where it is shown that the parties did not intend it") (footnote omitted);

---

**10.** Despite this conclusion the court recognizes that plaintiff dealt with SLD officials who acted incompetently. The court's empathy, however, cannot create a compensable property interest for purposes of the Fifth Amendment. The following excerpt from the affidavit of Gil Cyphert, one of plaintiff's general partners, *illustrates the ineptitude of the SLD officials who were involved with the subject land:*

> [O]n April 24, 1991, Ms. Burg, for the first time, advised that there appeared to be a problem regarding SLD's ability to issue the right-of-way. Specifically she advised me that she had just learned that on November 16, 1987, the United States Government had taken title to the State Trust Lands located north of the ... Property....
>
> ... On July 7, 1991, Ms. Burg advised me that SLD had made a series of record keeping mistakes with regard to ... [the] right-of-way application and the 1987 relinquishment of the relevant State Trust Lands to the United States

of America. In particular, Ms. Burg told me that SLD had failed to record the original right-of-way application, that had been filed by the prior owners of the ... Property, in the Track Record Book (the "Docket") that was required by law to be maintained by SLD. Further, Ms. Burg indicated that [the] SLD had mistakenly failed to notify LPG [or plaintiff] of the federal government's request for relinquishment of the State Trust Lands located north of the ... property. Finally, Ms. Burg stated that SLD had also erred when it failed to note the relinquishment at the time SLD approved ... [the] right-of-way application in May of 1988.

Affidavit of Gil Cyphert, May 1994, ¶¶ 10–11. Although the court does not condone the incompetence of state employees, which neither defendant nor any document emanating from the state dispute, the court lacks jurisdiction to effectuate an equitable result—a result that can only be obtained through plaintiff's state court litigation.

25 Am.Jur.2d *Easements and Licenses* § 35 (same).[11]

■ As previously established, the purpose of the congressional land grant in this case is "to produce a fund, accumulated by [the] sale and *use of the trust lands,* ... [to] support the public institutions designated by the Act." *Lassen,* 385 U.S. at 463, 87 S.Ct. at 587. This purpose signifies that the parties could not have intended an easement by necessity, which arises by operation of law, and for which no payment is required. *See Snell v. Rupert,* 541 P.2d 1042, 1046 (Wyo. 1975) (stating that, according to common law, easement by necessity does not anticipate payment of compensation), *overruled by Ferguson Ranch, Inc. v. Murray,* 811 P.2d 287 (Wyo.1991) (holding state no longer recognizes common-law way of necessity due to state statute). Given that plaintiff has not adduced any proof that the state was compensated for the use of the ROW corridor, plaintiff's property rights theory must fail as contrary to the parties' intent.

Plaintiff supports its right to an easement by necessity by citing, in order of reliance, *Bydlon v. United States,* 146 Ct.Cl. 764, 175 F.Supp. 891 (1959); *State of Utah v. Andrus,* 486 F.Supp. 995 (D.Utah 1979); and *Montana Wilderness,* 496 F.Supp. 880, which hold that an easement by necessity may exist over federal lands. Plaintiff argues that if such an easement can exist over federal lands, then the doctrine must be applicable to state trust lands, which are derived therefrom. None of these cases, however, addresses the precise situation posed by plaintiff's case, which is the role of an Enabling Act that contains express land disposal restrictions. For example, plaintiff relies on *Bydlon,* wherein the Court of Claims found an easement by necessity, allowing the property owners to use the air space over federal lands to access their property. *Bydlon,* however, did not involve an Enabling Act, which is crucial to the validity of plaintiff's claim.

*See* 146 Ct.Cl. at 771–72, 175 F.Supp. at 894–95 (Whitaker, J. dissenting) (noting liability should have been based on fact that air space is a public highway).

In *Andrus,* which treated Utah's Enabling Act, the court implied an easement across federal lands encircling the state school trust lands. The court noted the importance of allowing the state access to the state trust lands "so that those lands ... [could] be developed in a manner that ... [would] provide funds for the common schools." *Andrus,* 486 F.Supp. at 1009. "Without access the state could not develop the trust lands in any fashion and ... [the lands] would become economically worthless....," which would subvert Congress' intent. *Id.* at 1002.

Although *Andrus* reiterates the fundamental purpose of the Enabling Act, it poses a factual situation distinct from the instant case. First, the *Andrus* court implied the easement by necessity across federal, not state, trust lands. Second, the placement of federal lands precluded the state from gaining access to the trust lands, which thereby prevented the development of the lands and the accumulation of revenue. In this case the undisputed facts reveal that the state successfully was subdividing and selling the trust lands to generate revenue for the trust funds. Thus, the purpose of the Enabling Act was realized. The United States posed no bar to the accumulation of trust funds. The state, acting through the SLD, exercised its authority and discretion to retain the ROW corridor, given that it had not received any compensation for that land as required by the Act. Finally, *Andrus* involved Utah's Enabling Act, which did not include the express restrictions set forth in the New Mexico–Arizona Enabling Act.

To further support the position that a common-law easement may be implied over federal lands, plaintiff relies on *Montana Wilderness,* which involved a congressional rail-

11. Although *Bickel* does not appear to be the source for this proposition, the court notes that the Ninth Circuit in *Superior Oil* denied implying an easement by necessity in light of the intention of the parties, as evidenced by an evaluation of the purposes of the congressional land grant. The court stated that " '[t]he necessity does not in any case create the right. It is only a circum-

stance resorted to for the purpose of *showing the intention of the parties,* and raising an implication of a grant.' " *Superior Oil,* 353 F.2d at 37 (quoting Thompson, 2 *Real Property* § 364 at 430 (1961)). The *Superior Oil* court indicated that, although it applied federal law, its result would not have differed under Arizona law.

road land grant. The court implied an easement across federal lands in order to allow the railroad company to access the lands granted to it pursuant to the congressional grant. Before implying the easement, the court focused on the purposes of the land grant, stating that the "grant[ ] was [designed] to induce private companies to undertake the task of building the transcontinental railroad....," which would facilitate settlement of the west. 496 F.Supp. at 885. The court reasoned that without access to the granted lands, the gift of the lands "would be ... a barren gift," because the railroad could not be completed without such access. *Id.* at 886. Similar to *Andrus*, the purposes of the congressional grant in *Montana Wilderness* could not be achieved without granting an easement by necessity.[12]

In contrast, the purpose of the Enabling Act in this case has been and continues to be satisfied. The state, acting through the SLD, has engaged in the sale, lease, and disposal of state trust lands and has applied the proceeds therefrom to the appropriate trust funds. By granting plaintiff's easement by necessity, the court would not be furthering the purpose of the Enabling Act, because, pursuant to common law, one does not pay money for such an easement. In addition, plaintiff has not established that any money was paid for the ROW corridor. This failure to compensate the trust fund directly contravenes the purpose of the Enabling Act, which runs contrary to the holdings in both *Andrus* and *Montana Wilderness*. *See Montana*

*Wilderness*, 496 F.Supp. at 886 (holding that an easement by necessity may be implied across federal lands "whe[re] ... doing so will effectuate the purposes of the original land grants to the railroad").[13]

Because plaintiff has no compensable property interest, its takings claim must fail.[14]

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.

---

12. As partial support for implying an easement by necessity, the court in *Montana Wilderness* stated that Congress passed the congressional land grant with the general assumption "that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question." 496 F.Supp. at 886 (citation omitted). In 1910 when Congress enacted the Enabling Act, it arguably was aware of this same common-law assumption and accordingly included the express restrictions in the Act to supersede this principle. *See* Enabling Act § 34, 36 Stat. 578. Implying an easement by necessity is inconsistent with the express purposes and requirements of the Enabling Act.

13. Plaintiff also relies on *United States v. Jenks*, 22 F.3d 1513 (10th Cir.1994). The court did not address the propriety of the property owner's common-law access claims, but, instead, held

only that notwithstanding any common-law rights the property owner may have, the owner must apply for a special use permit to cross the lands of the Forest Service. The court found that the relevant Forest Service regulations required consideration of common-law rights prior to issuing a permit. This holding does not support the position that plaintiff has an easement by necessity over state trust lands which were granted to the state on explicit conditions.

14. Defendant also maintains that even assuming, *arguendo*, that plaintiff possesses a compensable property interest, plaintiff has failed to prove that the federal Government performed an affirmative act that interfered with plaintiff's property right. Plaintiff also raises an estoppel argument with respect to the actions of the SLD. In light of the court's ruling, the court need not consider these issues.